LOTTINGER, Chief Judge.
Evelyn P. McKnight was charged by bill of information with obstruction of justice (of a criminal proceeding in which a sentence of death or life imprisonment may be imposed). La.R.S. 14:130.1. She pleaded not guilty and filed a motion for change of venue. After a hearing, the court granted the motion for change of venue. The state has appealed, urging in a single assignment of error that the court erred when it granted the motion for change of venue.
FACTS
Testimony introduced at the preliminary examination indicates that, on the morning of July 15, 1994, the Sheriffs Office in Livingston Parish was notified that twenty-two-month-old Matthew Populis was missing. Defendant had often served as the child’s baby-sitter, and Matthew had spent the previous night at defendant’s residence in Holden. Over the next few days, law enforcement officers and numerous volunteers conducted an intensive search in the neighboring areas as they attempted to locate the child. Initially, defendant told the authorities that she was not aware of what had happened to Matthew, and authorities believed the child had been kidnapped by one of his parents or by a stranger.
As part of the investigation, investigators spoke with defendant’s twelve-year-old son, who told them he and Bobby Jordan (a man who lived at defendant’s residence) had taken *770 Matthew to the Tiekfaw River, whereupon Jordan threw the child into the river. As a result of this information, investigators secured a warrant and arrested Jordan for first degree murder. Aided by the defendant’s son, the authorities located the child’s body on July 20. When investigators later questioned defendant about the child’s disappearance, she admitted that her son had told her what had happened to the victim. Based on defendant’s awareness of the child’s death at a time when she was leading authorities to believe the child had merely disappeared (and the destruction of evidence which resulted from the delay), on July 21 investigators arrested defendant for obstruction of justice. When the investigators next talked to defendant’s son, the boy told them that he had been with his mother when she (and not Jordan) had thrown the child off the bridge. When investigators questioned defendant further, she insisted that she wanted to take Matthew to the hospital after finding him bleeding and unconscious, but Jordan refused and it was Jordan who threw the child into the river. She also said that it was she and not her son who was with Jordan. Eventually, authorities released Jordan from custody on the ground of insufficient evidence. The record does not indicate that anyone is currently 13charged with the child’s murder.
Defendant sought a change of venue on the ground that prejudicial pretrial publicity made it impossible for her to receive a fair trial in Livingston Parish. At the hearing held on the motion, she introduced three types of evidence: (1) copies of newspaper articles and videotapes of television news broadcasts; (2) testimony of an expert in the area of psychology and the designing and conducting of surveys; and (3) testimony concerning a survey conducted of people previously called for jury duty in Livingston, Tangipahoa, and St. Tammany Parishes. The state did not call any witnesses or introduce any exhibits.[1]
The newspapers introduced by defendant were 14 editions of the Denham Springs-Livingston Parish News, a newspaper of general circulation issued twice each week in Livingston Parish. The papers date from July 17, 1994, until January 19, 1995. According to an affidavit included with the exhibit, the paper has an average distribution of 9,903 copies. Each edition of the paper included at least one or more articles about the incident. In addition to including factual accounts of the search efforts, the subsequent arrests of Jordan and defendant, and the status of court proceedings, the articles contain repeated references to statements by “authorities” that defendant might be arrested for first degree murder because of evidence she participated in causing the child’s death and in disposing of the body. The articles also include an extensive discussion of the mysterious death of a baby left in defendant’s care about two years earlier.
At the hearing, defendant also introduced videotapes from three television stations: WBRZ-Channel 2, WAFB-Channel 9, and WVLA-Channel 33. A list introduced in connection with the two tapes from WBRZ indicates there were fifty-eight broadcasts on this case dating from July 15 through January 26. (The station apparently has as many as five news programs each day.) The tape from WAFB includes several news reports; the exact number of broadcasts and the dates are not evident. The tape from WVLA includes only brief footage of an apparent press conference and does not reveal any actual news broadcast. No testimony was introduced in connection with the videotapes; and there is no evidence concerning the viewing areas or ratings of these television stations.
| Nhe broadcasts from WAFB and WBRZ reveal fairly extensive coverage of the search for the victim, the discovery of his body, the funeral, the arrests of Jordan and defendant, and the subsequent court proceedings. On *771 several occasions, defendant is shown in prison clothing; and on more than one occasion cameras were allowed inside the parish jail to film defendant’s prison cell and to show her as she walked within the jail. The broadcasts refer to having received information from the District Attorney’s Office and the Sheriffs Office. There are several interviews with officials from these offices, in which authorities indicate they have reason to believe defendant was involved in the murder and, thus, charges might be upgraded to first degree murder upon the receipt of additional evidence. In one report, the District Attorney indicates authorities have reopened the investigation into the death of the baby who died two years earlier while in defendant’s custody. The broadcasts also include interviews with Jordan (after his release) and Jordan’s mother, in which they blame defendant for the death of Matthew Populis and the other child. Several reports focus upon the grief felt by family members of the victim and by the mother of the other child. At least one report mentions that authorities at one time were investigating the possibility Matthew had been molested before his death. One of the reports indicates defendant twice failed a polygraph test.
In support of the motion for change of venue, defendant called Dr. Hunter Downing, a professor from Southeastern Louisiana University who was accepted as an expert in the area of psychology and in the designing and conducting of surveys. Downing testified that, when she conducted an informal survey of graduate students from Livingston, Tangipahoa, and St. Tammany parishes, she found the students from Livingston Parish were more opinionated and knowledgeable about the case than students from St. Tammany Parish. She then conducted a formal survey of people previously called for jury duty in those same parishes.
The two investigators who conducted the-survey for Downing randomly selected the people to be surveyed from a list of people called for jury duty on a previous occasion in Livingston Parish and St. Tammany Parish.[2] According to Downing, 96.8 percent of the respondents from Livingston Parish said they had knowledge of the Matthew Populis case, while only 21.4 percent of those people surveyed in St. Tammany Parish |5replied similarly. Downing also found 20 of the 30 people surveyed in Livingston Parish believed the baby-sitter (defendant) was responsible for the child’s death; and only 3 percent of the Livingston Parish respondents had no idea who was responsible.[3] In St. Tammany Parish, 77 percent did not know who was responsible, and nobody named the babysitter as being the person responsible. Downing was convinced the survey was appropriate as about 33 percent of the target population (people called for jury service on a particular occasion) were surveyed.
Downing noted that comments made by the people surveyed in Livingston Parish showed hostility toward defendant. The investigators who conducted the survey recorded any comments made by the people being surveyed. The people surveyed in St. Tammany Parish made no comments, but numerous comments were made by Livingston Parish respondents, such as “I think they ought to fry the bitch,” “Hell ain’t going to be hot enough for her,” “I wish that I was on that *772 jury, we’d bar-b-que her,” “How many babies does this make,” “She’s already tried in my mind, why waste more money,” and “If I get on that jury, she [sic] a goner.”
Downing also reviewed literature and research by other practitioners on the effect of pretrial publicity on jurors. Two of these articles were introduced into evidence.. According to Downing, research indicates pretrial publicity can prejudice potential jurors, especially in small towns, for well-known public officials, and for murder and sex crimes. The articles reviewed by Downing also indicate the usual remedies (extended voir dire, judicial admonitions, and deliberations by the jury) are not effective at remedying the problem; and, while continuances are effective in cases where the bias is produced by factual publicity, continuances do not remedy the problem in emotionally charged cases. After evaluating the results of the survey and reviewing newspaper articles and television broadcasts on the case, Downing concluded it would be impossible for defendant to receive a fair trial in Livingston Parish.
Jl1
Although a defendant is not entitled to a jury that is totally ignorant of the case to be heard, the Louisiana Constitution grants the accused the right to trial by an impartial jury. State v. Bennett, 527 So.2d 1126, 1127 (La.App. 1st Cir.1988). See La.Const. art. I, § 16. In deciding whether or not to grant a defendant’s motion for change of venue, article 622 of the Code of Criminal Procedure requires the trial court to consider if prejudice, undue influence, or any other reason will deny the defendant a fair trial in the parish in which the prosecution is pending. The court also must decide if such prejudice or influence will affect either the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial. State v. Clark, 442 So.2d 1129, 1132 (La.1983).
Factors to consider in determining whether or not a change of venue is appropriate include: (1) the nature of the pretrial publicity and the particular degree to which it has circulated in the community; (2) the connection of governmental officials with the release of the publicity; (3) the length of time between the dissemination of the publicity and the trial; (4) the severity and notoriety of the offense; (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant; and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire examination. State v. Bell, 315 So.2d 307, 311 (La.1975).
In urging a change of venue for trial, the defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. The defendant must establish that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Wilson, 467 So.2d 503, 512 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985); Bennett, 527 So.2d at 1127. In unusual circumstances, prejudice against the accused sufficient to mandate a change of venue may be presumed. This presumption of prejudice will attach only when the trial atmosphere is entirely corrupted by press coverage or when it is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a judicial system of fairness. State v. Moseley, 587 So.2d 46, 52 (La.App. 2d Cir.), writ denied, 589 So.2d 1066 (La.1991). See Dobbert v. Florida, 432 U.S. 282, 302-03, 97 S.Ct. 2290, 2302-03, 53 L.Ed.2d 344 (1977); Clark, 442 So.2d at 1134. If prejudice is not presumed, the defendant must establish the existence of actual prejudice on the part of prospective jurors. See State v. Goodson, 412 So.2d 1077, 1080 (La.1982).
Whether or not a defendant has made the showing required for a change of venue is a question addressed to the trial court’s sound discretion, which will not be disturbed on appeal absent an affirmative showing of error and abuse of that discretion. Wilson, 467 So.2d at 512. Although the trial court possesses a broad range of discretion in this area, the reviewing court is required to *773 make an independent evaluation of the facts to determine whether or not the accused received a fair trial unfettered by outside influences. State v. Daniels, 628 So.2d 63, 70 (La.App. 1st Cir.1993).
II
Applying these precepts, we conclude that the defendant has failed to show there is either actual or presumed prejudice against her to the degree a fair trial is impossible. As there has not yet been either a mock voir dire or an actual voir dire examination, it is impossible to decide at this point whether actual prejudice against the accused exists on the part of prospective jurors in Livingston Parish. See Wilson, 467 So.2d at 512-14; Goodson, 412 So.2d at 1080. Although the survey shows the Livingston Parish respondents were overwhelmingly familiar with the case, the survey alone of only 30 possible jurors does not establish actual prejudice in the collective minds of the community. Voir dire will establish whether prospective jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.
We also find that this is not a case in which prejudice may be presumed. The record demonstrates only one courtroom disturbance, occurring during the hearing on motions, when a witness testified about the victim’s face having deteriorated as a result of maggots. The court’s comments indicate the disruption subsided quickly. Although we reverse the trial court’s ruling, we notice that law enforcement officers and prosecutors released publicity about the case (through press conferences and interviews, including several on-camera interviews), indicating their belief defendant participated in the child’s murder (something for which she was not charged) and fueling speculation defendant was involved in the death of the other child. However, we find the trial atmosphere has not been utterly corrupted by the press coverage. See Goodson, 412 So.2d at 1080-81. Additionally, defendant failed to present sufficient testimony establishing the extent of the publicity. There was no evidence concerning the viewership or ratings of the television stations or the population of Livingston Parish. See Clark, 442 So.2d at 1132-33.
jjj
Thus, we conclude that the record before us does not support the trial court’s ^determination that defendant could not have a fair and impartial trial in Livingston Parish. See Bennett, 527 So.2d at 1128. Accordingly, the ruling granting the motion for change of venue is vacated. We are influenced in our decision by the fact that by the time our judgment is final almost one and one-half years -will have elapsed since the crime and the period of intense publicity following the crime. In all probability, the force of the publicity will have been spent before the time the case is set for trial. See State v. Rodrigue, 409 So.2d 556, 560 (La.1982). Nevertheless, in case we have misjudged the situation in our independent review of the facts, or in the event of further unnecessary release of publicity, the trial court is instructed to defer ruling on the motion until after conducting either a “mock” voir dire or the actual voir dire. See Rodrigue, 409 So.2d at 560; State v. Baldwin, 388 So.2d 679, 682 n. 2 (La.1980). See also Bell, 315 So.2d at 311-12.
RULING VACATED; REMANDED WITH INSTRUCTIONS.
FITZSIMMONS, J., concurs and assigns reasons.

. On appeal, the state attaches to its brief a map of Livingston Parish and charts which show the number of registered voters in each ward and precinct in the parish. These documents were not introduced at the hearing. In reviewing the state’s appeal, we may not consider these attachments as only that which is in the record may be reviewed by an appellate court on appeal. See State v. Robertson, 518 So.2d 579, 585 (La.App. 1st Cir.1987) writ denied, 523 So.2d 227 (La. 1988). See also Uniform Rules — Courts of Appeal, rule 2-12.4; En Banc Order, First Circuit Court of Appeal (Aug. 24, 1995) (restricts the filing of attachments to briefs).

. The defense introduced 81 completed survey forms: 30 from Livingston Parish, 7 from Tangi-pahoa Parish, 42 from St. Tammany Parish, and 2 which did not indicate a parish. Downing indicated she intended to survey people from only Livingston and St. Tammany parishes. However, the list provided by the Clerk of Court for Livingston Parish included some names from Tangipahoa Parish.

. Our own review of the surveys reveals results which are slightly different from Downing’s testimony. Of the 30 people who checked they were from Livingston Parish, 28 indicated they were familiar with the Matthew Populis case. (One of the two respondents who indicated he was not familiar with the case went on to provide information about the case and answer some of the remaining questions, showing he actually was familiar with the case.) For the question which asked who was responsible for the child's death, nine responses said baby-sitter or named defendant; eight used language such as "her" or "woman”; two said "both”; five said something like “him” or "guy”; two said "handyman”; and three had no response or were unsure. Downing assumed that all references to a female were references to defendant. Even under this assumption, only 19 people (and not 20) pointed to defendant as being the person or one of the persons responsible for the child’s death.