739 So.2d 343 (1999)
STATE of Louisiana
v.
Evelyn P. McKNIGHT.
No. 98 KA 1790.
Court of Appeal of Louisiana, First Circuit.
June 25, 1999.
*346 Scott M. Perrilloux, District Attorney, Amite, Zata W. Ard, Assistant District Attorney, Amite, for Appellee State of Louisiana.
Frederick Kroenke, John DiGiulio, Scott J. Collier, Baton Rouge, for Appellant Evelyn P. McKnight.
Before: FOIL, KUHN and WEIMER, JJ.
FOIL, Judge.
Defendant, Evelyn P. McKnight, was charged by bill of information with obstruction of justice (of a criminal proceeding in which a sentence of death or life imprisonment may be imposed), in violation of La. R.S. 14:130.1. She pled not guilty and filed several pre-trial motions. After a hearing, the trial court granted defendant's motion for change of venue. The state appealed to this court, urging in a single assignment of error that the court erred when it granted the motion for change of venue. This court vacated the ruling and remanded the matter, with instructions. State v. McKnight, 95-1486 (La.App. 1 Cir. 12/15/95); 665 So.2d 768. Defendant filed an application for a writ of certiorari and/or review to the Louisiana Supreme Court, which was granted. The supreme court reinstated the district court's ruling. State v. McKnight, 96-0176 (La.4/19/96); 671 So.2d 933.
Defendant also filed a motion to quash, which was denied by the trial court. She applied for writs with this court, seeking review of the ruling. This court found that defendant's claims had no merit and denied the writ application. State v. McKnight, 96-0879 (La.App. 1 Cir. 6/18/96).
After a trial, the jury returned a verdict of guilty. Defendant filed post-trial motions for new trial and post-verdict judgment of acquittal. The trial court denied the motions and sentenced defendant to forty years at hard labor. Defendant also filed a motion to reconsider the sentence, which was denied by the trial court. Thereafter, defendant appealed, urging forty-six assignments of error. Assignments of error numbers 1, 4-9, 11-14, 16-19, 22-26, 28, 31, 33-40, and 42-44 were not briefed and are considered abandoned. Uniform Rules-Courts of Appeal, Rule 2-12.4.

FACTS
On July 14, 1994, twenty-two-month-old Matthew Populis spent the night at the home of defendant, a friend of the child's mother who had often served as the child's baby-sitter. The next morning, defendant's daughter and niece discovered that Matthew was missing from the home. Over the next few days, law enforcement officers and numerous volunteers conducted an intensive search in the neighboring areas as they attempted to locate the child. Defendant told authorities that she was *347 not aware of what had happened to Matthew.
As part of the investigation, authorities spoke with Rodney McKnight, defendant's twelve-year-old son, who initially denied having knowledge of the child's whereabouts. Later, Rodney told investigators that he had been with Bobby Jordan (a man who lived at defendant's residence) when Jordan threw the child into the Tickfaw River. Based on this information, the authorities had Rodney show them the location where the child was thrown into the river. The child's body was found on July 20, and Jordan was subsequently arrested for first degree murder. Investigators continued to question Rodney and he ultimately revealed that his mother, not Jordan, had thrown Matthew into the river. When investigators questioned defendant further, she said that she was with Jordan, not her son. She explained that she found Matthew bleeding and unconscious and wanted to take the child to the hospital, but Jordan refused to drive there. Instead, he drove to a bridge where he threw the child into the river. Eventually, authorities released Jordan from custody on the basis of insufficient evidence. The record does not indicate that anyone has been convicted or is currently charged with the child's murder.
At trial, Robin Populis, the victim's mother, testified that Evelyn McKnight began babysitting for Matthew when he was seven and one-half months old. Defendant babysat several times per week and Ms. Populis never paid her for babysitting. The longest continuous period that she babysat was three or four days. Ms. Populis stated that defendant bought clothes, diapers, and food for Matthew, and even had a crib and playpen for the child at her house. She testified that defendant had never injured the child.
On July 14, Ms. Populis went to visit defendant, who was recuperating from surgery. Defendant asked Ms. Populis to allow Matthew to spend the night. Although she hesitated to leave Matthew while defendant was not feeling well, she agreed when defendant stated that her sixteen-year-old niece, April McKnight, would help care for the child. On the morning of July 15, when Ms. Populis learned that her son was missing, she rushed to the McKnight home and called the Livingston Parish Sheriff's Office. Defendant told her that she did not know Matthew's whereabouts.
Rodney McKnight, defendant's son, testified he was twelve years old when the incident involving Matthew Populis occurred. On July 14, Rodney watched television until he went to bed at 9:00 or 9:30 p.m. When he awoke the next morning, his mother was in the room taking Matthew out of the crib. Defendant said she was getting the child because Ms. Populis was coming to pick him up. Rodney fell back asleep. When he woke up again, he went to his mother's bedroom, knocked on the locked door and asked if she needed help watching Matthew. Defendant replied "no" and told Rodney he could go back to bed. Because he was unable to sleep, he returned to his mother's bedroom. This time, defendant allowed him to come into the room. She told him that Matthew was not breathing, and Rodney saw that Matthew looked pale and his lips were blue. Defendant tried to revive the child by administering CPR, but was unsuccessful. When Rodney asked why they could not take the child to the hospital, defendant said it was, "because she would go to prison." Rodney and his mother wrapped the child in a blanket, put him in a canvas bag and left the house. Defendant placed the canvas bag on the floorboard of the front passenger side of the automobile. Rodney, who was wearing a baseball cap, sat with his legs crossed on the front passenger seat.
During the drive, Rodney asked his mother several times about going to the hospital, but she replied that she would go to prison if they did so. After driving for about thirty minutes, defendant crossed a bridge over the Tickfaw River. She drove *348 down to a nearby church where she took Matthew out of the bag and put him on her lap. The child did not move or make a sound. Defendant drove back to the bridge and stopped. She started to get out of the car but saw a truck, so she got back in, drove down the road and turned around again. Defendant drove back to the bridge, stopped and got out with the child. While Rodney was in the vehicle, he saw his mother hold the child by his right arm and leg and throw him into the river. On the drive home, neither spoke to each other, but Rodney believed that his mother was crying.
When they arrived home, Rodney saw their neighbor, Mr. Traylor, outside in his yard. Defendant drove her vehicle into the carport at an angle, as far in as it would go, and they both exited the driver's side door. No one was awake in the house yet. Defendant and Rodney took a blanket from his bed, prepared a pallet on the living room floor, turned on the television, and put a bottle from the refrigerator on the pallet. According to Rodney, he and his mother returned to her bedroom where they laid down and cried. His mother then instructed him to say that he and Matthew had woken up, had gone into the living room to watch cartoons on the television, and that Matthew had fallen asleep. She further instructed Rodney to state that he had gone back to sleep with his mother. Then defendant told Rodney that, when he returned to the living room, he should ask if anyone had seen Matthew. Rodney then fell asleep in his mother's bedroom and, when he awoke, he did as instructed. When he asked where Matthew was, everyone began to look for him. His sister, Amanda, called Ms. Populis, who rushed to the McKnight home and called the police.
A few days later, as per his mother's instructions, Rodney told the police that Bobby Jordan was involved in Matthew's disappearance. His mother told him to say that he had seen Jordan masturbating near the child that morning. Rodney was instructed to say that he rode with Jordan when Jordan took Matthew in the car and threw him into the river. Rodney further testified that, because the police continued questioning him regarding his version of the events, he finally told the truth and admitted that he had lied about Jordan's involvement.
On cross-examination, Rodney admitted that he changed his version of what happened from his first statement in which he denied knowing about the child's disappearance. Rodney denied being threatened if he did not change his original statement, but he admitted he was scared he would "go to jail" if he did not tell the police what they wanted to hear. He further stated that he was tired of the police questioning him and that "they were never satisfied" until he implicated his mother. On re-direct, Rodney stated that he got tired of the police questioning him, so he "told them the truth."
April McKnight, defendant's niece, testified that she spent the night at defendant's home on July 14. She and her cousins watched television and played with Matthew. Defendant remained in her bedroom, but April and Amanda took the child in the bedroom to show her something cute Matthew had done. Defendant told them to leave the child in her room and she would put him to bed. Later, Rodney went to bed in his own room, and the girls stayed up until 1:00 or 2:00 a.m. When April passed by Rodney's room on her way to bed, she saw Rodney in his bed, but did not notice if Matthew was in his crib. The next morning, she and Amanda could not find Matthew. While looking for him in the house, the girls saw the kitchen door was open and noticed Bobby Jordan was outside picking up trash. They kept on looking around the house, then Amanda went outside and asked if Jordan had seen Matthew. Jordan replied that he had not and that he did not know whether Ms. Populis or someone had come and gotten Matthew. The girls looked for the child in defendant's room and found Rodney asleep *349 with his mother. Amanda woke her mother and told her that the child was missing. Defendant started crying and said, "[o]h, God, I'm going to go to jail." April told defendant to return to bed and that they would find the child.
April testified that, when the police came and began questioning everyone, defendant instructed April to say that she had dressed Matthew in a certain "onesie" and put him in the baby bed the night before. April related this false information to the police in her first statement. A day or two later, after April admitted this lie, her mother contacted the law enforcement authorities and they obtained another statement from April. On cross-examination, April admitted that she lied in her statement when she said she had dressed Matthew and put him to bed. April further explained that, when defendant asked her to lie, defendant said "[I]f I'm well enough to put the baby in the bed, they're going to think that I took the car and did something to that baby." She also testified that the police kept telling her that she had something to do with the child's disappearance, and that the interrogating detective was verbally abusive and con-frontational.
Debbie McKnight testified that she had known defendant for fifteen years and was married to the brother of defendant's deceased husband. When defendant had outpatient surgery for reversal of a tubal ligation, Debbie kept defendant's children at her home for about a week. On July 14, she agreed to the children's requests to return home, even though she did not think that defendant was well enough to care for them. Debbie also sent her older daughter, April, to help defendant with the children. Debbie, who was the medical assistant for the gynecologist who performed defendant's surgery, noted that she called defendant when she did not keep her doctor's appointment on July 15. Defendant explained that Matthew had disappeared from the home. Later that evening, defendant asked Debbie to take her children from the home because the police were scaring Rodney and making him cry.
Paul Traylor, defendant's next door neighbor, testified that his wife had agreed to drive defendant to her doctor on July 15 for some problems defendant was having after her surgery. Traylor left for work early on the morning of July 15 and noticed that McKnight's automobile and truck were both parked in the yard facing the roadway. When his job was cancelled, Traylor returned home between 6:30 a.m. and 6:40 a.m. and noticed that McKnight's automobile was gone. A few minutes later, someone drove up in the vehicle and parked diagonally in the McKnight carport. Although he could see a person on the passenger side who looked like "a little kid with a baseball cap," Traylor could not identify the occupants. Around 9:30 a.m. that morning, Traylor learned that Matthew was missing and helped in the search. He testified on cross-examination that several weeks before the incident, defendant left Matthew at his home while she ran an errand. When Bobby Jordan came to get the child, Matthew became upset and did not want to go with him. Traylor also stated that Bobby Jordan sometimes wore a baseball cap.
Cecilia Traylor, Paul Traylor's wife, testified that she was awakened by her husband at 7:00 a.m. on July 15. He was worried about defendant because he did not see her vehicle and knew that she planned to go to the doctor that morning. Around 7:30 a.m., Mrs. Traylor saw someone return in the McKnight vehicle and drive into the carport at an angle close to the entrance to the home. Because of the tint on the windows, Mrs. Traylor could not identify the persons in the vehicle. Later that morning, after she learned that Matthew was missing, Mrs. Traylor spoke with defendant, who stated that a friend was supposed to borrow her vehicle that morning. Defendant made a telephone call in Mrs. Traylor's presence and asked for a person named Karen. McKnight stated that she was told Karen was not *350 there, and she was not sure if Karen had actually used the vehicle. Mrs. Traylor also saw defendant's son that morning. She stated that he looked tired and that he was wearing a baseball cap. Defendant commented that Rodney was tired because he had stayed up all night. Mrs. Traylor also testified that she vaguely remembered an incident when Bobby Jordan picked up Matthew at her home and Matthew fussed. She also stated that, on occasion, she saw Bobby Jordan wearing a baseball cap.
Bobby Jordan testified that he lived in defendant's house in exchange for $300.00 rent. He slept on a sofa in the living room and performed chores around the house. On July 14, he went to sleep around 9:00 or 10:00 p.m. When he woke up the next morning, Jordan folded a blanket that was on the floor in front of the television and picked up the baby's bottle. When Jordan put the blanket in Rodney's bedroom closet, neither Rodney nor Matthew was in the room. After he became aware that Matthew was missing, defendant asked him to drive her car up and down the road to look for the child. Jordan denied throwing the child off a bridge or ever having sex with the child.
On cross-examination, Jordan admitted that he had seen bruises on the child in the past and that he told authorities he had seen Matthew's mother beat him. Jordan further admitted that he received immunity in exchange for his cooperation and understood that he would not be prosecuted for any crime arising out of Matthew's disappearance and death. Although Jordan denied having sex with or murdering the child, he admitted he "would do anything to stay out of jail."
Duncan Kemp, the district attorney at the time of the investigation, testified that Bobby Jordan was given limited immunity in exchange for information and that the information received from Jordan was not to be used against him in a subsequent prosecution. Kemp added that Jordan did not appear to have much pertinent information.
Jennifer Smith Love, an FBI agent, testified that she became involved in the matter and interviewed defendant, who denied harming or knowing the location of the child. In that interview, defendant stated that she did not believe that Bobby Jordan would hurt the child, but that it was possible.
Detective Kearney Foster of the Livingston Parish Sheriff's Office testified that defendant never admitted knowledge of the child's location during the investigation and search. Based on information Rodney gave them, the child's body was found on July 20, the same day that defendant first admitted she knew facts about the location of the body. Detective Foster admitted that there was no physical evidence linking defendant to the bridge where the child's body was thrown into the river. He further testified that he was aware that the child's mother had acquired a $10,000.00 life insurance policy on the child.
Rhonda Thompson, a matron at the Livingston Parish Jail, testified that she came in contact with defendant in the jail. Defendant was upset and told Ms. Thompson about the events of the child's disappearance. Defendant said she had seen Jordan standing and masturbating over the child. Defendant brought the child into her room and took a shower. When she returned to the bedroom, defendant noticed the child's face was swollen on one side, his mouth was bleeding, and his teeth were knocked out. Defendant intended to take the child to the hospital, but Jordan followed her to her vehicle. Jordan got in and said he would drive, but drove in a direction opposite from the hospital. Suddenly, Jordan stopped on a bridge, grabbed the child from her arms and threw him into the river. When they arrived back home, defendant told her son, Rodney, what had occurred and told him not to admit she had been present or she would "go to jail."
About two months later, defendant revealed to Ms. Thompson that she was upset about Bobby Jordan's release from jail. *351 She stated that "she knew why Bobby gave her pills that night and could not believe that her son could do something like that." Thompson explained that she did not understand defendant's statement.
Don Zuelke, a polygraph examiner, testified that he worked with the Livingston Parish Sheriffs Office on this case. On July 25, he saw defendant, advised her of her rights, and questioned her about the child's disappearance. Defendant gave a statement indicating that, when she awoke on July 15, she observed Jordan standing over Matthew and masturbating in the living room. She confronted Jordan, who said he was on his way to the bathroom. Jordan pulled up his pants and sat down on the couch. Defendant checked Matthew, who appeared okay, and went back to her bedroom and dozed off. When she heard a door slam, defendant got up again and saw Jordan outside in the front yard. Defendant immediately checked the baby and saw that Matthew appeared to be unconscious, had blood coming from his mouth, and had swelling on the side of his face. She ran outside and confronted Jordan, who said that he did not harm the baby. Defendant then picked up Matthew and took him to her bedroom, where she cleaned the blood from his mouth, took his gown off, and wrapped him in a striped blanket. She summoned Jordan to take them to the hospital. Instead of driving to the hospital as requested, Jordan drove in the opposite direction. He stopped on a bridge, took the child from her and threw him off the bridge. Defendant further told Zuelke that, when they returned home, she woke up her son, told him of the events and told him to keep the information secret.
Dr. Emile Laga, a forensic pathologist, testified that he examined the body of the victim, Matthew Populis. The body was partially covered by mud and was in a state of mild to moderate decomposition. The body had been scavenged by animals, particularly those parts of the body containing large amounts of blood, such as the eyes, mouth, nose and genitalia. Dr. Laga acknowledged that there were three areas of injury or abnormality on the child's body: a bruise on the right side of the head, an injury to the front of the neck, and a prolapse of the rectum. He noted that the bruise on the right side of the head was about two inches in diameter and extended through the skin and soft tissue to the bone. The doctor stated that this injury most likely resulted in a concussion and loss of consciousness and, while it was not severe enough to cause instant death, it may have contributed to the final event. There was evidence that the blow to the child's head injured the brain stem, which controls vital signs, breathing, heartbeat, and blood pressure. The neck injury was two inches wide, across the Adam's apple, and indicated a strangulation-type of grip had been applied. The examination revealed bleeding and a deprivation of oxygen into the lungs, a condition caused by decompressing the neck and not allowing air in the lungs. Although the doctor could not state that the strangulation injury killed the child, it possibly contributed to the cause of death. Doctor Laga also discussed the prolapse of the rectum, which is a condition in which the lower part of the intestines fall out of the rectum. He testified that this could have been caused by the decomposition of the body, during which the gases inside push the intestines out of the enlarged rectum. Dr. Laga stated that he could not exclude the possibility that the victim may have been sexually abused and that something may have been inserted into the anus.
Dr. Laga testified that a mud-like fluid was found in the victim's trachea, mouth, esophagus and stomach. He collected samples of the substance from the lung tissue, which he submitted to a laboratory for examination. Ultimately, the results of that examination showed the presence of fibers, other trace minerals and particulates, and microorganisms (diatoms) in the lungs. These organisms only live in the water, never in the lungs. Dr. Laga stated *352 that this finding is significant because it means that the child was still alive when he was thrown into the river and was capable of swallowing and aspirating the mud-like material down into his stomach and lungs. Dr. Laga noted that, at the time of the autopsy in July of 1994 and the subsequent writing of the autopsy report, he did not have the lab results showing the presence of diatoms in the lungs. On the basis of the lab results, Dr. Laga concluded that the finding of diatoms indicated that the final cause of death, preceded by a blow to the head and injury to the neck area, was acute asphyxiation due to drowning. He testified that, although he could not determine which injury occurred first due to the decomposition of the body, he believed that the child survived the injuries and was able to breath as many as three times after he was thrown into the water.
Testing of the victim's body fluids showed a blood alcohol content of .078%. Dr. Laga testified that there are two explanations for this fact: (1) the child drank a substance containing alcohol, or (2) the alcohol was produced by fermentation of the yeast in the body while in the river. Dr. Laga stated that .02% or .03% is the highest blood alcohol level that could be attributed to the fermentation process. Thus, the doctor concluded that, at the time of death, the blood alcohol level was.04% or .05%. The child would have to ingest about 20-30% of a can of beer or shot of whiskey to obtain a blood alcohol level of .05%.
Dr. Laga admitted that his autopsy report stated that the cause of death was probable blunt trauma to the right temporal head. He also admitted that, after he became aware of the FBI report of diatoms in the deepest parts of the child's lungs, he came to believe that drowning contributed to the death, but that this opinion was not in his report.

MOTION TO QUASH
In assignments of error numbers two, three and thirty-two, defendant argues that the trial court erred in denying her motion to quash. First, she contends that the statute providing for the offense of "obstruction of justice," La. R.S. 14:130.1, is inapplicable because the criminal investigation in this matter is not a criminal proceeding "in which a sentence of death or life imprisonment may be imposed." She argues that since there was no indictment for an offense in which death or life imprisonment could be imposed, only the minimum penalty provided by the statute, which refers to "any other criminal proceeding," may be imposed. She further argues that the failure to quash the indictment is not harmless error and that, under the double jeopardy clause, a retrial must be limited to the least grade of the obstruction of justice offense. Defendant further contends that, if the statute is applicable to this matter, the penal section is unconstitutionally vague because a criminal investigation does not provide an adequate standard to determine guilt or innocence.
La. R.S. 14:130.1, providing for the offense of obstruction of justice, states in pertinent part:
A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as hereinafter described:
(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
(a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, *353 or United States law enforcement officers; or
(b) At the location of storage, transfer, or place of review of any such evidence.
. . . .
B. Whoever commits the crime of obstruction of justice shall be subject to the following penalties:
(1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.
(2) When the obstruction of justice involves a criminal proceeding in which a sentence of imprisonment necessarily at hard labor for any period less than a life sentence may be imposed, the offender may be fined not more than fifty thousand dollars, or imprisoned for not more than twenty years at hard labor, or both.
(3) When the obstruction of justice involves any other criminal proceeding, the offender shall be fined not more than ten thousand dollars, imprisoned for not more than five years, with or without hard labor, or both.
We find no merit in defendant's assertions that the statute does not apply to this case in the absence of a formal murder indictment. Here, the clear and express language of the statute indicates it is applicable to matters involving "an actual or potential present, past, or future criminal proceeding." (Emphasis added.) Moreover, the term "criminal proceeding" encompasses action by both law enforcement personnel and judicial authorities. State v. Jones, 610 So.2d 1014, 1016 (La. App. 1st Cir.1992). In Jones, this court found that, under the language of the statute, it is unnecessary that an underlying criminal proceeding be resolved before the appropriate penalty provision for obstruction of justice can be determined. The nature of the underlying criminal proceeding, for purposes of determining the appropriate section of the obstruction of justice statute, should be determined by the date(s) on which the acts of obstruction occurred. Id. It necessarily follows that this statute is applicable to situations in which there has been only a criminal investigation and no formal indictment.
We likewise disagree with defendant's assertion that the statute's penal provision is unconstitutionally vague. Statutes are presumed to be valid and must be upheld as constitutional whenever possible. A statute is unconstitutionally vague if a person of ordinary intelligence is not capable of discerning its meaning and conforming his conduct thereto. A penal statute must give adequate notice that certain contemplated conduct is proscribed and punishable by law and must provide adequate standards for those charged with determining the guilt or innocence of an accused. State v. Crawford, 98-0585, pp. 2-3 (La.App. 1 Cir. 12/28/98); 727 So.2d 589, 590. In interpreting criminal statutes, La. R.S. 14:3 requires that the provisions "be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." Id. at p. 3, 727 So.2d at 590.
As stated above, the statute applies to situations involving a murder investigation without a formal indictment. The statute clearly sets forth what conduct is proscribed and what the punishment is for a violation. Under Jones, the underlying criminal proceeding need not be resolved before the appropriate penalty provision for obstruction of justice can be determined. We conclude that La. R.S. 14:130.1 is not unconstitutionally vague.
For these reasons, we find that these assignments of error lack merit and conclude the trial court correctly denied defendant's motion to quash.

CHALLENGES FOR CAUSE
In assignment of error number ten, defendant contends that the trial court erred *354 in denying two of her challenges for cause of potential jurors. She argues that two prospective jurors, Ms. Cheryl Utsler and Ms. Ann D'Amico, should have been excused for cause because they were unable to conclude that their emotions about the victim and the offense would not influence their verdict. The state cites jurisprudence concerning challenges for cause and notes that the trial court is vested with great discretion.
Initially, we note that defendant incorrectly refers to one of the prospective jurors as Ms. Ann D'Amico. The record indicates that a Janet D'Amico was questioned during voir dire. Based on defendant's transcript page references, we believe that defendant is referring to prospective juror Janet D'Amico. Thus, we will review that portion of the voir dire.
The voir dire transcript indicates that Ms. D'Amico initially stated that she had formed an opinion about defendant's guilt or innocence years before when she first heard about the matter. Ms. D'Amico also noted that she had a child around the age of the victim. She stated that, at present, she did not have an opinion and could render a verdict based upon the evidence. Although she could not say that she would put aside her emotions "100%" in rendering the verdict, Ms. D'Amico stated that if she was not convinced defendant committed the crime, she would not find defendant guilty. The trial judge acknowledged that the trial would elicit upsetting evidence, but stated that this would be true for all people, not just Ms. D'Amico. The court concluded that Ms. D'Amico could be fair and impartial and denied the challenge for cause.
As to the voir dire of Ms. Cheryl Utsler, the record indicates that at first she said she would find the defendant guilty despite what the evidence proved. Later, she stated that she would not vote to convict if she was not convinced that defendant committed the crime. Although she was not "100%" sure she could set aside her emotions, she reiterated that she could be a fair juror and would not return a guilty verdict if there was insufficient evidence to support the verdict. After the challenge for cause was made, the trial court questioned Ms. Utsler and she again answered that she could listen to the evidence and be an impartial juror.
The trial court denied defendant's challenges for cause as to both prospective jurors. Defendant used two of her peremptory challenges on Ms. D'Amico and Ms. Utsler; neither served on the jury.
La.Code Crim. P. art. 797 provides the grounds for challenges for cause. That article states, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
. . . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
. . . .
(4) The juror will not accept the law as given to him by the court; ....
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the prospective juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to the law reasonably may be inferred. State v. Thompson, 489 So.2d 1364, 1370 (La.App. 1st Cir.), writ denied, 494 So.2d 324 (La.1986). The trial court is vested with broad discretion in ruling on a challenge for cause. Its ruling will not be disturbed on appeal absent a showing of an abuse of that discretion. State v. Dufrene, 461 So.2d 1263, 1266 (La.App. 1st Cir.1984).
*355 In 1983, La.Code of Criminal Procedure article 800 was amended to remove the requirement that a defendant exhaust all of his peremptory challenges before complaining of a ruling denying a challenge for cause. See 1983 La. Acts No. 181, § 1; State v. Lutcher, 94-0291, p. 6 (La.App. 1 Cir. 3/3/95); 652 So.2d 545, 548, writ denied, 95-0847 (La.11/13/95); 662 So.2d 464. Prejudice is presumed, however, if a defendant exhausts his peremptory challenges and establishes an erroneous denial of a defense challenge for cause. State v. Ross, 623 So.2d 643, 644 (La.1993). Under such circumstances, reversible trial error exists. State v. Lutcher, 94-0291 at pp. 6-7; 652 So.2d at 548.
The ultimate responses of both Ms. Utsler and Ms. D'Amico show that they agreed to put aside their personal feelings and render a verdict based upon the evidence presented. Thus, we do not find an abuse of the trial court's discretion in denying those two challenges for cause. See State v. Munzy, 464 So.2d 1040, 1046 (La. App. 1st Cir.), writ denied, 468 So.2d 1203 (La.1985).
Since defendant failed to establish that she exhausted her peremptory challenges and that the trial court erroneously denied her challenges for cause, no prejudice is presumed and no reversible error exists. This assignment of error lacks merit.

GRUESOME PHOTOGRAPHS
In assignments of error numbers fifteen, twenty-one and twenty-nine, defendant argues that the trial court erred in allowing prejudicial and gruesome autopsy photographs of the victim to be introduced. The state argues that the trial judge is vested with wide discretion in determining whether the probative value outweighs any prejudicial effect.
Louisiana Code of Evidence article 401 provides:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Louisiana Code of Evidence article 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. Gruesomeness of photographs does not, in and of itself, prevent admissibility. The trial court's admission of allegedly gruesome photographs will be overturned on appeal only if the prejudicial effect of the photographs clearly outweighs their probative value. No error will be found unless the photographic evidence is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Hebert, 96-1884, p. 16 (La.App. 1 Cir. 6/20/97); 697 So.2d 1040, 1049, writ denied, 97-1892 (La.12/19/97); 706 So.2d 450.
The photographs show the state of decomposition of the child's body after it remained in the river for about one week. These photographs were relevant to show the specific intent to distort the results of the investigation of the child's disappearance and death. When we balance the probative value of the photographs with the likelihood the jury was inflamed simply upon viewing these exhibits, we find the probative value of the evidence outweighs the possible prejudicial effect. The trial court did not err in its ruling.
These assignments of error lack merit.

OPINION EVIDENCE
In assignment of error number twenty, defendant contends that she was denied a *356 fair trial when the trial court allowed the pathologist's testimony concerning results of a post-mortem examination which were not disclosed to the defense. Defendant urges that she was denied her right to a fair trial when the trial court allowed testimony from the pathologist regarding the cause of death. The state argues that the autopsy report indicating drowning as a possible cause of death was made available to the defense.
The testimony of the forensic pathologist, Dr. Emile Laga, indicated that he performed a post-mortem examination of the victim on July 20, 1994, and issued a report dated August 1, 1994. At that time, his opinion as to the cause of death was probable blunt trauma to the right side of the temporal portion of the head. Dr. Laga testified that, after he became aware of the FBI report indicating the presence of diatoms in the deepest parts of the child's lungs, he then believed that the final cause of death was acute asphyxiation due to drowning. He admitted that this opinion was not in his original autopsy report, and stated that he did not prepare a new report after learning of the FBI report results.
Prior to trial, defendant moved for discovery of all reports of examinations and tests that were made by the state, pursuant to La.Code Crim. P. art. 719. That article provides, in pertinent part:
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy ... any results or reports... of a physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial.
This duty to disclose is a continuing one, requiring the district attorney, if he discovers or obtains evidence prior to or during trial, to promptly notify the other party and the court of the existence of the additional evidence. La.Code Crim. P. art. 729.3. A failure to comply with this duty can result in sanctions ranging from the granting of a continuance to prohibition of introduction of the non-disclosed subject matter. La.Code Crim. P. art. 729.5.
The discovery rules, La.Code Crim. P. art. 716 et seq., are intended to eliminate any unwarranted prejudice which could arise from surprise testimony. See State v. Toomer, 395 So.2d 1320, 1329 (La.1981). Not every failure by the state to comply with these rules automatically requires a reversal, but when such a failure results in prejudice to the defendant, it does constitute reversible error. Thus, in the event the state failed to comply with the discovery rules, it must be determined whether the defendant was actually prejudiced by the nondisclosure and whether the trial court abused its discretion. See State v. Vaccaro, 411 So.2d 415, 427 (La.1982).
In State v. Harris, 627 So.2d 788 (La. App. 2d Cir.1993), writ denied, 93-3188 (La.3/18/94); 634 So.2d 851, the victim was initially examined by a pediatric nurse practitioner, who prepared a written report. The nurse asked a doctor to verify her findings. The doctor examined the victim, read over the nurse's written report, and agreed with the conclusions. At trial, the doctor testified that she did not create a separate written report because the nurse's report was adequate. During the trial, defendant argued that he requested the results of all examinations of the victim, that the doctor performed an examination of the victim and had results from that examination, that the district attorney had knowledge of those results, and that those results were intended for use at trial. The district attorney responded that there were no tangible results from the doctor to give to defendant, other than the nurse's report that had been disclosed. The trial court agreed and allowed the doctor's testimony into evidence. On appeal, the court found that *357 defendant had possession of the only reported results of the victim's physical examinations, that defense counsel effectively cross-examined the doctor, and that the defendant was not surprised by the substance of the doctor's testimony. Since defendant failed to show that he was prejudiced by the admission of the testimony, the appellate court found no abuse in the trial court's discretion. State v. Harris, 627 So.2d at 796-797.
We find this case to be similar to Harris. Here, defendant does not argue, nor is there any evidence in the record, that a supplemental pathology report issued by Dr. Laga was in the possession, custody, control, or knowledge of the district attorney or that one even existed. Additionally, under La.Code Crim. P. art. 723, defendant was not entitled to any statements which Dr. Laga made to the prosecutor(s). See State v. Ondek, 584 So.2d 282, 294 (La.App. 1st Cir.1991).
For these reasons, this assignment of error lacks merit.

CROSS-EXAMINATION OF WITNESS
In assignment of error number twenty-seven, defendant argues that the trial court erred in not allowing defendant to cross-examine witness Bobby Jordan regarding alleged acts of physical and sexual abuse against his ex-wife. The state argues that because the witness was not convicted of a crime, this evidence was inadmissible.
At trial, defendant wanted to cross-examine Bobby Jordan about his alleged sexual and physical abuse of his ex-wife. On appeal, defendant notes Dr. Laga testified that the victim's prolapsed rectum was consistent with penal penetration. Defendant claims that questions about Jordan's abuse of his ex-wife were necessary to support her theory that Bobby Jordan sexually abused the child and that he, not defendant, removed the child from the home and disposed of the body. The trial court found that the line of questioning was not appropriate, but allowed a proffer of the testimony of Jeanell Jordan, Bobby's ex-wife.
The evidence at issue herein consists of prior "bad acts." This evidence is inadmissible under La.Code Evid. art. 608 B as a means of attacking a witness' character for truthfulness. See State v. Ellis, 94-599, p. 27 (La.App. 5 Cir. 5/30/95); 657 So.2d 341, 355, writ denied, 95-2095 (La.12/8/95); 664 So.2d 421 and 95-1639 (La.1/5/96); 666 So.2d 300. Official Comment (b) to Article 608B notes that Louisiana traditionally prohibits cross-examination of a witness as to specific instances of conduct (including vices or courses of conduct). Furthermore, the extent of questioning on cross-examination is subject to the discretion of the trial judge to limit repetitive or harassing interrogation. Id.
For the above reasons, this assignment of error lacks merit.

INSUFFICIENT EVIDENCE
In assignment of error number forty-five, defendant argues that there was insufficient evidence to support her conviction. Specifically, she contends that the evidence failed to show: (1) there was a criminal proceeding in which a sentence of death or life imprisonment may be imposed, as required by the statute; (2) defendant had knowledge of the killing of a human being with the specific intent to kill or inflict great bodily harm; and (3) defendant had the specific intent to distort the determination of the cause of death. The state argues that knowledge that the act of obstruction would affect a criminal proceeding, not proof of the elements of the underlying criminal offense, was required. The state also contends that the required element of specific intent to distort the results of a criminal investigation may be inferred from the defendant's action in removing the victim's body from the home.
Defendant's first contention has been fully addressed in our discussion of the *358 denial of her motion to quash. We concluded there is no requirement that the state show that an actual criminal proceeding has been instituted. Thus, this claim is without merit.
Defendant further contends that the evidence did not show that she had the intent to harm the child. She claims that the testimony that she tried to revive the child excludes knowledge of a homicide in which the offender had specific intent to kill. In other words, defendant could not have known the obstruction of justice involved a murder because the death did not result from an intentional killing. She also claims that the circumstantial evidence of this intent element did not exclude every reasonable hypothesis of innocence, particularly that the underlying offense was the result of negligent homicide, which did not require the specific intent to kill or inflict great bodily harm.
A review of the wording of Subsection (1) of La. R.S. 14:130.1 shows that it requires that an offender act with "the specific intent of distorting the results of any criminal investigation or proceeding." See State v. Hookfin, 602 So.2d 757, 758-759 (La.App. 4th Cir.1992), writ denied, 604 So.2d 1316 (La.1992). See also State v. Dauzat, 532 So.2d 275, 277 (La.App. 3d Cir.1988), writ denied, 538 So.2d 589 (La. 1989). The statute does not require specific intent to commit the underlying offense (to kill or inflict great bodily harm.) Therefore, this claim lacks merit.
Defendant also argues that because the results of the investigation into the victim's death were only delayed, not distorted, the state proved, at most, an attempt to obstruct justice. We disagree.
An attempt requires doing or omitting "an act for the purpose of and tending directly toward the accomplishing of [the] object...." La. R.S. 14:27. Here, the state proved that defendant actually committed the act of "tampering with the evidence." First, she removed the victim from the home and threw him into the river. Defendant then returned home and prepared a pallet on the living room floor, deliberately creating the false appearance that the victim had been on the pallet when he "disappeared." Further, defendant lied to the police concerning her knowledge of the victim's whereabouts and later implicated Jordan in the child's disappearance. Finally, she urged her son to lie about his knowledge of her involvement in the matter. Clearly, there was sufficient evidence to prove that defendant committed the completed offense of obstruction of justice, as opposed to merely attempting the offense.
Accordingly, for the above reasons, this assignment of error lacks merit.

JURY INSTRUCTIONS
In assignments of error numbers thirty and forty-one, defendant contends that the trial court erred in failing to instruct the jury that it must find, beyond a reasonable doubt, sufficient evidence of the criminal offense underlying the obstruction of justice offense. The state notes that defendant's argument is based upon her premise that there must be a charged offense mandating the sentence of death or life imprisonment and argues that there is no statutory requirement that there be a conviction of the underlying offense.
At the jury charge conference, the defense attorney objected to the instructions and noted that the state had the "obligation of proving each and every element of the substantive underlying offense (first degree murder or second degree murder or the responsive verdicts to those offenses)."
La.Code Crim. P. art. 807 provides that a timely "requested special charge must be given to the jury if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." The refusal to give a requested special charge does not warrant *359 reversal of a defendant's conviction unless it prejudices substantial rights of the accused. La.Code Crim. P. art. 921; State v. Shilling, 440 So.2d 110, 114 (La.1983).
We have already determined that the offense of obstruction of justice did not include as an element that the underlying offense in the criminal proceeding or investigation be proven beyond a reasonable doubt. Including the requested charge would have been an inaccurate statement of the law. Thus, the trial court did not err in denying defendant's request for a special jury charge.
These assignments of error are without merit.

EXCESSIVE SENTENCE
In assignment of error number forty-six, defendant argues that the maximum sentence of forty years which was imposed was excessive.
Article I, Sec. 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. Excessiveness of a sentence is a question of law which is reviewable. A sentence may be excessive either by reason of its length or because the circumstances warrant a less onerous sentencing alternative. In other words, a sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. Moreover, maximum sentences are appropriately imposed only for the most serious violation of the described offense and for the worst kind of offender. A trial court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion. State v. Tate, 506 So.2d 546, 552 (La.App. 1st Cir.), writ denied, 511 So.2d 1152 (La.1987).
A trial court's reasons for imposing sentence, as required by La.Code Crim. P. art. 894.1, are an important aid to this court when reviewing a sentence alleged to be excessive. State v. Christy, 509 So.2d 829, 831 (La.App. 1st Cir.), writ denied, 513 So.2d 296 (La.1987).
The applicable provision of the obstruction of justice statute provides for punishment by imprisonment at hard labor for not more than forty years. La. R.S. 14:130.1. Herein, defendant received the maximum sentence. In imposing sentence in this case, the trial judge noted in its comments that it had reviewed the presentence investigation report, letters from the mother of the victim, and statements from defendant's family and clergy. The judge also acknowledged that defendant was a first felony offender.
The judge further stated that "from the outset the investigation was manipulated by" defendant's contradictory statements, that she interfered with the investigation and that there was a futile search for the child which kept "alive the hopes" of the parents. Finally, the judge noted that defendant encouraged her son to "make false statements," an action her son has had to accept. Finding that defendant was the worst kind of offender and that this offense was serious, the judge imposed the maximum sentence.
We acknowledge defendant's status as a first felony offender. However, as noted by the trial judge, this crime involved a heinous offense, particularly in light of the fact that the child's parents, law enforcement officials and the community continued to search for the child and they continued to hope for a successful reunion. Additionally, the longer the child's body remained in the river, the more it decomposed and deteriorated, a fact which was *360 very traumatic to the parents. Thus, we conclude that this case involved the most serious violation of obstruction of justice and that defendant represents the worst kind of offender. We do not find the sentence imposed herein to be so grossly disproportionate as to shock our sense of justice. Accordingly, the sentence imposed is not excessive.
This assignment of error lacks merit.
For the foregoing reasons, defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
WEIMER, J., concurs with reasons.
WEIMER, Judge, concurring.
My review of the evidence convinces me there is proof sufficient to support a conclusion by the jury that the state proved beyond a reasonable doubt that a first degree murder was committed. The testimony of defendant's son that his mother intentionally threw the child from the bridge; the testimony of the forensic pathologist, Dr. Emile Laga, that the infant was alive when thrown from the bridge into the water below and, thus, drowned; and the fact that the child was under the age of twelve combine to satisfy the elements of first degree murder pursuant to LSA-R.S. 14:30(A)(5).
There is no requirement that anyone be indicted for the underlying offense for an accused to be convicted of obstruction of justice. LSA-R.S. 14:130.1 When defendant and her son returned home after she threw the infant into the river, defendant took a blanket from the bedroom, prepared a pallet on the living room floor, turned on the television, and put a baby bottle on the pallet. In doing so, she deceptively arranged a scene so that it would appear the infant had been on the floor of the living room before he "disappeared." These acts, which occurred after the first degree murder, constituted tampering with evidence because these acts were "the intentional alteration, movement, removal, or addition of any object or substance ... [a]t the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers." LSA-R.S. 14:130.1(A)(1)(a).
Regarding the defendant's argument that the sentence is excessive, I note that the defendant's involvement in lies and deceit resulted in the arrest of an individual for first degree murder. Further, one cannot begin to comprehend the trauma also inflicted on the defendant's own son by involving him in this matter. The defendant's acts consisting of hiding evidence, fostering lies, telling lies, engaging in deceit, and manipulating the investigation subsequent to the infant's being thrown from the bridge, clearly enhanced her culpability and justify the maximum sentence imposed by the trial court.