# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-456

**STATE OF LOUISIANA**

**VERSUS**

**SCOTT ALLEN COOPER**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 93636
HONORABLE VALERIE GOTCH GARRETT, DISTRICT JUDGE

**********

## LEDRICKA J. THIERRY
### JUDGE

**********

Court composed of D. Kent Savoie, Candyce G. Perret, and Ledricka J. Thierry, Judges.

**REVERSED AND REMANDED.**

**Alfred F. Boustany, II**
**Alfred F. Boustany, III**
**Chase A. Manuel**
**Boustany Law Firm**
**421 West Vermilion Street**
**Lafayette, LA 70501**
**(337) 261-0225**
**COUNSEL FOR DEFENDANT-APPELLEE**
    **Scott Allen Cooper**

**Donald D. Landry, District Attorney**
**Elliott C. Cassidy, Assistant District Attorney**
**Fifteenth Judicial District**
**P. O. Box 288**
**Crowley, LA 70526**
**(337) 788-8831**
**COUNSEL FOR APPELLANT:**
    **State of Louisiana**

**THIERRY, Judge.**

The State of Louisiana appeals a judgment of the trial court granting Defendant's Motion for Change of Venue from Acadia Parish to Lafayette Parish.

## FACTS AND PROCEDURAL HISTORY

On May 16, 2021, Garrison Gautreaux, a seventeen-year-old male, was found murdered inside his vehicle in Rayne, Louisiana. An investigation resulted in the arrest of Defendant, Scott Allen Cooper, and a Co-Defendant, Robert Moreno. Both were charged with second degree murder.

Judge David Smith was originally alotted the case but recused himself on June 18, 2021. After Judge Smith's recusal, the case was alotted to Judge Kristian Earles, who presides over the only other criminal division in Acadia Parish. After increasing Defendant's bond, Judge Earles issued an order recusing himself on March 3, 2022. Upon Judge Earles recusal, the case was randomly assigned to Judge Valerie Gotch Garrett.

Both Defendants filed motions to change venue in their respective cases. Defendant Cooper's Motion for Change of Venue was filed on December 2, 2022. The motion to change venue alleged that the victim was from a prominent Acadia Parish family who was related to and/or closely involved with other prominent families in the area. Specifically, the motion stated that the victim was the godson of Acadia Parish attorney Scott Stefanski, who along with other family members, practices law in Crowley, Louisiana. The motion further stated the victim "grew up in the Stefanski household, with the Stefanski children." The motion alleged that due to the "villainization" of Defendant publicly and in social media, the public perception of Defendant was tainted such that he could not receive a fair trial in the small, rural parish. Additionally, Defendant alleged that regional and local news outlets reported, allegedly incorrectly, that Defendant's conviction for a previous

homicide was overturned due to a technical trial error and that Defendant seemed remorseful only about the impact the case had on him personally. In addition to arguing that his case met the factors set forth in *State v. Bell*, 315 So.2d 307 (La.1975), Defendant contended that this is one of those exceptional circumstances where prejudice should be presumed. *State v. David*, 425 So.2d 1241 (La.1983).

The State filed an opposition to Defendant's motion on January 23, 20232, arguing a change of venue was not warranted in the present case for either defendant. The motions to change venue were tried together.

At the hearing on the motion to change venue, counsel for both parties presented their arguments, and the court took the matter under advisement. On May 11, 2023, the judge issued a lengthy opinion granting the change of venue as to Defendant Cooper but denying Co-Defendant Moreno's motion. In the judge's ruling, she first noted that the victim, a junior at Notre Dame High School in Crowley, was very loved by his family, friends, and everyone in the close-knit community. The small nature and closeness of the community, Judge Garrett stated, was evidenced by the in-court support shown to the victim's family, to the point that Judge Garrett had to reduce the number of people in the courtroom to allow hearings to be conducted. She explained that the parish is one in which "everyone talks," and information that is supposed to remain confidential rarely does. She noted that the original judge assigned to Defendant's case set his bond extremely high, then recused himself. The case was reallotted to another judge, who again increased the bond amount, then recused himself. Judge Garrett further noted that the victim's family instituted a civil action against Defendant, and the judge to whom that case was initially assigned recused himself as well.

In her ruling, Judge Garrett discussed Defendant's second argument, that the views of the community as expressed in comments to Facebook posts by local news

media and by the Rayne Police Department (evidenced by screenshots of the posts/comments) indicated a presumption of guilt. The State argued that this normally occurs in high profile cases, and, at the time of the hearing, nothing had been reported in the news since June 2021, despite several hearings being held and bonds reduced. Next, Judge Garrett mentioned Defendant's argument that the victim's relationship with the notable Stefanski family would likely make the community feel obligated to convict both defendants regardless of the evidence presented. There was no allegation that this family would influence the jury pool; rather, as prestigious lawyers and politicians widely known in the community, arguably their supporters would be inclined to find Defendant guilty. As for Defendant's overturned prior conviction, Judge Garrett noted that Defendants argued that news articles made it sound as though Defendant got off on a technicality, and the comments on social media reflected a belief that Defendant got away with murder once and was attempting to do so again. Additionally, Defendant pointed out that all potential jurors summoned would be exempt from duty for two years, greatly reducing the available jurors for other trials in the parish.

Both defendants requested a transfer of venue to Lafayette Parish, a place of higher population. The State contended that the transfer was requested simply for the defense's convenience and that any transfer should be to other neighboring parishes with similar populations. Judge Garrett rejected this argument, noting that transfer to a similar low population parish would be ineffective. Judge Garrett felt that Lafayette Parish would be the most judicially efficient due to its proximity to the original parish and because the Fifteenth Judicial District Court District Attorney's main office is located there. In granting the change of venue for all further proceedings in Defendant's case to Lafayette Parish, Judge Garrett further reasoned:

Mr. Cooper is from this community and has familial ties to this community. When his prior conviction was overturned, he returned to this community. In the case of Defendant Cooper, the Court will specifically take into account the nature of the pretrial publicity, the severity and notoriety of the offense, the area from which the jury will be drawn, and the other events occurring in the community which either affect or reflect the attitude of the community or individual juror toward the defendant.

The vast majority of pre-trial publicity in this case revolved around Scott Cooper and his prior criminal case. This Court is very concerned of [sic] Mr. Cooper's ability to receive a fair trial due to the nature of the pre-trial publicity as it relates to articles claiming he "got off on a technicality." Through the articles, comments on the articles, actions in the Courtroom, and overall attitude towards Mr. Cooper pretrial, this Court believes that the community of persons where his jury will be pulled from has a prejudice towards him.

As stated above, the test of whether change of venue is required is whether there can be secured, with reasonable certainty, from citizens of the parish, a jury whose members will be able to try the case on law and evidence, uninfluenced by what they may have heard, and who will give defendant full benefit of any reasonable doubt arising either from evidence or from the lack thereof. At this time, this Court does not believe that Mr. Cooper can secure a jury from Acadia Parish, who will hear this case uninfluenced by the articles and comments made about him and his past. This Court believes the combination of Mr. Cooper's ties with Acadia Parish, his prior criminal history, and the victim's ties with this community, gives rise to the granting of Mr. Cooper's Change of Venue Motion.

Mr. Cooper has the right to a fair and just trial. This Court believes that Mr. Cooper can receive that in Lafayette Parish where he will have the ability to have a jury selected from a larger jury venire and also from a community of people that are not so invested in his past.

The State lodges this appeal, contending Judge Garrett erred in granting Defendant's Motion for Change of Venue, asserting the following assignment of error:

The district court was clearly erroneous and abused its judicial discretion in changing the venue of this case because Cooper did not present sufficient evidence to meet his burden of proof.

4

## I.    *Applicable Law.*

The right to an impartial jury and a fair trial is guaranteed to every defendant. See U.S. Const. amend. VI; La.Const. art. I, § 16; see also La.Code Crim.P. art. 797(2). "To effect this guarantee, the law provides for a change of venue when a defendant establishes that he or she will be unable to obtain an impartial jury or a fair trial at the place of original venue." *State v. Magee*, 11-574, (La. 9/28/12), 103 So.3d 285, 298, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56 (2013).

Louisiana Code of Criminal Procedure Article 622 addresses change of venue and provides:

> A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.

> In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.

The second paragraph of La.Code Crim.P. art. 622 "overrides the challenge for cause concept and is to be superimposed upon the entire proceeding." *State v. Bell*, 315 So.2d at 310.  In *Bell*, the court explained:

> A change of venue ought to be available even though, individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly.

*Id. Quoting* the Official Revision Comment to La.Code Crim.P. art. 622.

In exceptional circumstances, prejudice against a defendant may be presumed. *State v. David*, 425 So.2d 1241.  "[U]nfairness of a constitutional magnitude will be

presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob." *Id.* at 1246. Otherwise, the defendant bears the burden of showing actual prejudice. *State v. Vaccaro*, 411 So.2d 415 (La.1982); *State v. Adams*, 394 So.2d 1204 (La.1981).

In *State v. Bell*, 315 So.2d at 311, the Louisiana Supreme Court set forth the relevant factors in determining whether actual prejudice exists:

> (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn; (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire.

## II. Evidence Presented in Support of the Motion to Change Venue.

In the present case, the murder of the victim occurred on May 16, 2021. Defendant presented at the hearing on the motion for a change of venue news articles concerning the murder of the victim, his prior offense, the victim's obituary, information released by the Rayne Police Department, and comments made online.

On May 20, 2021, State Representative John Stefanski shared the victim's obituary online, adding:

> This was a tough day. Garrison was a young man with his entire life in front of him. I knew him personally and know his entire family. Garrison's death makes no sense. I think we are all searching for answers. What I hope is that the person or persons responsible for his death are quickly brought to justice. Please pray for the Gautreaux family. Then pray that we bring closure to his murder and find those responsible.

6

The victim's obituary and several pictures showing his close connection with the Stefanski family were also included as evidence submitted in support of the motion for a change of venue. Messages on the funeral home's website expressed condolences to the victim's family and recounted fond memories of the victim.

On May 19, 2021, updated May 21, 2021, klfy.com reported, "Rayne teenager found shot to death in parking lot, police asking for help in searching for suspect." The article reported that the victim was pronounced dead at the scene, and it was believed he arrived at the location shortly before he was discovered. The public was asked to provide any information to the Acadian Parish Crime Stoppers' tip line.

An online post by kpel965.com (date unknown) included Defendant's mug shot and stated that 41-year-old Scott Cooper was arrested following the early morning murder of a 17-year-old male which was reported by the Rayne Police Department to have happened on May 16 in Rayne. Seven other law enforcement agencies assisted the Rayne Police Department, and since the investigation was ongoing, no further details were released.

On an unknown date, klfy.com reported that Chief Stelly stated that Defendant, of Church Point, Louisiana, was arrested for the murder of the seventeen-year-old from Rayne.

On May 22, 2021, an article was posted on evennews.com containing an updated booking photo under the headline, "Rayne PD release updated booking photo of Scott Cooper, the 41 year old who murdered a 17 year old." It reported that Defendant was arrested for the murder of a 17-year-old male in Rayne in a vehicle parked in the 100 block of North Polk Street. He was booked into the Acadia Parish Jail for second degree murder with a $2,000,000.00 bond set.

On May 24, 2021, on wgno.com, KLFY reported that Defendant was previously convicted and sentenced for a murder charge, but a trial error resulted in

the case being overturned. The article stated that in December 1997, weeks shy of Christmas day, five shots rang out in a Lafayette parking lot, and the two suspects drove to a remote area and set the car on fire. The article reported that "Earl Zenon was inside of the car when it was set on fire, living out the last moments of his life." Defendant was arrested for the crime on November 15, 2000. He was convicted as a principal to second degree murder and sentenced to life in prison with no chance of parole. The article stated that Defendant attempted to appeal his conviction for years, claiming civil rights violations. In January 2007, Defendant was granted post-conviction relief due to a trial error. He was granted a new trial but on a lesser charge of principal to obstruction of justice. He pled no contest to that charge in March of 2012 and was sentenced to ten years with credit for time served. The article then stated, "[o]ver two decades has passed since Earl Zenon was shot and killed. Another family is now mourning the loss of their son."

On an unknown date, KATC reported under the headline "Two indicted in shooting death of teen in Rayne," mugshots of each defendant with a short article reporting the defendants' ages, where they were from, and that they were indicted by a grand jury for the May 16 shooting of Garrison Gautreaux, a student at Notre Dame High School. The article stated that the victim was found dead in his parked vehicle, but no details regarding the incident or motive had been released. Concluding, the article stated the bond amount ($5,000,000.00) and that Defendant had previously served time for his part in a 1997 murder. A link was provided to read more about the earlier case.

On May 26, 2021, an article titled "Murder Suspect Accused in Previous Homicide," was released on AcadiaParishToday.com. The article recounted the facts of the prior murder, further stating that after being unsuccessful in claiming civil rights violations, Defendant was later successful in getting his conviction

8

overturned.  Because the victim was still alive at the time the car was set on fire and Defendant was not in the vehicle at that time, the death in the burning car could not form the basis for a conviction of accessory after the fact of second degree murder. Thus, Defendant faced a less severe charge of principal to obstruction of justice.  He subsequently entered a no contest plea and was sentenced to ten years in prison with credit for time served.

On May 27, 2021, KATC news disseminated online an article titled "Man accused in Rayne teen's death served time for part in 1997 murder."  This article provided brief facts of the present case.  It went on to state that court records show this was not the first time Defendant had been accused in connection with a fatal parking lot shooting.  The article provided details concerning the 1997 murder, naming Vince Moore as the shooter and Defendant as a principal.  After being shot in a drugstore parking lot, the victim, Earl Zenon, was later found in his burned vehicle, with the subsequent autopsy indicating that he was still alive when the fire started.  The autopsy also revealed the victim was shot in the back of the head, "indicating he was probably looking out the passenger window – where Cooper was standing – when he was shot."  After his arrest, Defendant told police that Moore shot Zenon because he wanted the "big bag of weed" that Zenon had.  He denied knowing that Moore was going to shoot Zenon.  Defendant also provided details of what occurred after the shooting.  The men drove the victim's car to a house where they picked up a blanket.  They then drove to Point Blue where Moore set the car on fire with Zenon in it, still alive.  They drove back to Lafayette, where they smoked Zenon's marijuana.  Defendant was indicted and convicted as a principal to second degree murder.  After serving approximately seven and one-half years at the Louisiana State Penitentiary, Defendant's conviction was vacated due to statements made by the prosecutor.  The new trial was delayed due to pending allotment

9

lawsuits, and in 2011, after the original charge was dismissed, Defendant pled no contest to a charge of principal to obstruction of justice. Although Defendant did not admit to knowing Moore was going to kill the victim, he did admit to arranging the purchase of marijuana from the victim. In sentencing Defendant, the judge said that the only thing Defendant seemed remorseful about was the impact the case had on his own personal circumstances. At sentencing it was noted that Defendant (seventeen years old at the time of the offense) was married, a father of five children, employed, and a regular church attendee. He was sentenced to ten years and six months but served only four additional days due to credit for time served. The article reported Defendant was released from probation in April 2015.

On May 21, 2021, the Rayne Police Department posted on its Facebook page that Chief Stelly announced Defendant's arrest for the May 16, 2021 murder of a 17-year-old male after various agencies assisted in the investigation. A week later, on May 28, 2021, the Department posted an article concerning the arrest of Co-Defendant Robert Moreno. The article named the agencies that assisted with the investigation, and Chief Stelly stated that, like all murders, this was a tragedy for the family and the community. There were 172 reactions to this post and 106 comments. Approximately six or seven of the sixteen pages of comments contained a back and forth "rant" between two individuals. A few comments mentioned that this was not the first time Defendant had killed, with one mentioning that he previously shot someone and set their vehicle on fire. Another comment mentioned that those proven guilty should receive the death penalty, and another suggested a rope hung over a branch at the courthouse square would work. A few others mentioned that the defendants needed to "rot" and that they did not deserve to live. While some comments reminded people to not judge until the evidence was presented, others were extremely supportive of the victim's family and questioned why others were

supportive of the defendants. Most of the remaining comments expressed gratitude to the investigative agencies and concern for the victim's family.

On May 28, 2021, KLFY reported online that Co-Defendant Moreno had been arrested and charged with second degree murder, listing very limited facts of the case. Under this article appeared another article titled "Man accused of murdering Rayne teenager let off of previous murder charge." That article simply stated, "Last week, Scott Cooper, 41, of Church Point, was arrested in connection for the murder." The mugshot of Defendant followed.

On May 28, 2021, updated July 7, 2021, nola.com published a picture of Defendant with a caption stating that he was arrested for second degree murder after a seventeen-year-old boy, identified by friends and family as Garrison Gautreaux, a junior at Notre Dame High School in Crowley, was shot and killed in Rayne on May 16.

On June 24, 2021, the Advocate released an online article titled "Two men indicted on murder charges in death of 17-year-old Garrison Gautreaux," briefly stating that Scott Cooper of Church Point and Robert Moreno of Houston were each indicted for second-degree murder in the death of Garrison Gautreaux who was found suffering from a gunshot wound to the chest in a vehicle around 1:00 a.m. on May 16. The victim, a student at Notre Dame High School in Crowley died at the scene. Each defendant was being held on $5,000,000.00 bond.

Another online article originally posted by "News 15 Staff" on May 16, 2021, was updated June 24, 2021. The article first reported that, according to Rayne Police Chief Carroll Stelly, officers were called to the scene of a parking lot in the 100 block of North Polk Street at 1:08 a.m. where they found an unresponsive male in a truck. The victim was pronounced dead at the scene and was identified by Notre Dame High School of Acadiana Parish as Garrison Gautreaux, one of their students.

No further details were given.  A second updated article stated that according to Chief Stelly, Defendant was arrested for the murder and Moreno, from Houston, was also charged.  On June 24, 2021, the post was updated to report that a grand jury handed down an indictment against both defendants for second degree murder. On the following page appears a post by Notre Dame High School stating:

> Our hearts are heavy today as we mourn the passing of Notre Dame junior, Garrison Gautreaux. Our thoughts and prayers are with his family and friends during this difficult time.
>
> In times like these, it seems as though words often fall short as we struggle to wrap our minds around tragedy.  However one thing that we as a Notre Dame family know how to do well is run to Our Lady, the patroness of our school, in our hurt and in our suffering, and ask her to be near to us[.]

In another article posted June 24, 2021, KLFY reported online under the headline "Pair indicted by Acadia Parish grand jury for May murder in Rayne," that Defendant and Moreno were indicted on charges of second degree murder and were both jailed with a $5,000,000.00 bond each.  The article reported that Defendant was previously convicted of murder, but the conviction was overturned when a district court found he was denied his right to confront a witness against him. A new trial was granted for the charge of principal to obstruction of justice, but Defendant entered a no contest plea and received a ten-year prison sentence.

On June 27, 2021, AcadiaParishToday.com reported the two defendants (pictures included) had been indicted in the May shooting of the Rayne teen.  The article gave a brief factual account of the murder, then stated Defendant had been arrested within the week of the murder.  The following week, Moreno was arrested, and both defendants were charged with second degree murder and each with a $5,000,000.00 bond.  The article defined indictment and second degree murder, adding that if convicted, the defendants faced life sentences without benefits.

Also introduced at the venue hearing were court minutes dated June 18, 2021, showing that Judge Smith denied motions for bond reduction for each defendant and then recused himself; a recusal order by Judge Earles recusing himself from both defendants' cases on his own motion "due to presiding over prior criminal proceedings;" and a recusal order by Judge Privat recusing himself from the civil lawsuit filed by the victim's family against Co-Defendant Moreno due to Judge Privat's family connection with the victim. Specifically, Defendant noted that all of the Acadia Parish judges were recused from the criminal matter.

### III. *Relevant Jurisprudence.*

In *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143 (2008), a murder case involving a notorious Louisiana serial killer, the Louisiana Supreme Court, in upholding the denial of a motion for change of venue, first discussed the nature of pre-trial publicity. In doing so, the court noted that the defendant filed over 5,000 pages of printed reports and transcripts published between 2002 and 2004 concerning the South Louisiana serial killer. Additionally, all but two of the one hundred twenty-five potential jurors stated they were at least vaguely familiar with the case. Only thirty-two percent (32%), or forty of the jurors, were excused for cause due to their exposure to publicity/opinions concerning the case. The defendant challenged sixteen jurors for cause, which, if all were granted, would have brought the percentage of cause challenges to forty-four percent (44%). The court acknowledged that the media coverage was extensive from arrest through trial, and prior to trial, the defendant was tried and convicted for the second degree murder of another victim which was reported in the media. The supreme court noted, "[d]espite media coverage of a defendant's conviction in another case, such coverage does not constitute prejudice as long as the coverage is solely factual and not inflammatory." *Id*. at 135. The record showed that the selected jurors assured the

court that they were able to decide the case based solely on evidence presented, and the trial court repeatedly admonished them not to view media coverage during voir dire and trial. Next, in considering the comments of government officials, the supreme court noted that comments of government officials were not included in many pretrial articles. Comments made by the East Baton Rouge Parish District Attorney's Office involved procedure and court proceedings, and statements by law enforcement were inconsistent, especially as to the killer's profile. As to length of time between comment and trial, the court noted that the defendant was arrested in May 2003, and his trial began in September 2004. Most of the investigation focused on other suspects. Thus, the defendant was not subjected to media coverage for a prolonged period, and publicity did not start until he was identified and arrested.

Next, the supreme court addressed the severity and notoriety of the offense noting that although extreme, when compared with similar first degree murder convictions, the facts were, unfortunately, not dissimilar from those previously reviewed by the court. Addressing the area from which the jury was drawn, the court noted that East Baton Rouge Parish had a population of 412,852, and the jury pool summoned was 1,300, which was larger than average. Over ninety-eight percent (98%) of the jurors polled had some knowledge of the case, but any who knew parties or witnesses were excused. As for other community events that affected the community attitude, most of the jurors stated they did not change their lifestyle while the serial killer was still on the loose. The defendant pointed out that 26,000 tips were received, but he failed to specify how many were from East Baton Rouge Parish nor how the tips established community bias. Finally, considering factors that likely affect the candor and veracity of prospective jurors, the supreme court noted that the jurors appeared to answer truthfully when asked about the defendant's guilt. Those

14

with a pre-existing opinion stated they could put it aside and consider only the evidence presented.

Ultimately, the supreme court held that a change of venue was unnecessary:

> In summation, considering that less than one-third of the prospective jurors were excused because of their inability to put aside their pre-trial exposure, defendant fails to demonstrate in the context of the other *Bell* factors that the undoubtedly high press coverage of the investigation was sufficient to alter the "candor and veracity" of the jurors's answers during voir dire examination. In fact, several jurors expressed their lack of enthusiasm for serving on the jury, despite their willingness to do so if called upon. The ever-changing profile of the serial killer, and the public perception of rampant mistakes in the investigation during the search for the serial killer would work as much in favor of defendant as the publicity would work against him. As we have previously observed, "the mere existence of any preconceived notion as to the guilt or innocence of the accused, without more, is insufficient to rebut the presumption of the juror's impartiality." *State v. Clark*, [02-1463 (La. 6/27/03),] 851 So.2d [1055] at 1071[, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433 (2004)]. Defendant fails to show the existence of pretrial publicity was such that it would color the jurors' voir dire responses to the point of making them unreliable and that he was therefore deprived of his right to trial by a fair and impartial jury. After carefully reviewing the record of this matter, defendant failed to show the trial court abused its discretion in denying his motion for a change of venue.

*Id*. at 137.

In *State v. Magee*, 103 So.3d 285, when assessing the nature and degree of pretrial publicity in a murder case, the court noted the defendant filed over 200 pages of newspaper articles, online public comments, television coverage transcripts, and multiple DVDs of major local media recordings. For approximately two months after the crimes, the murders were covered on the front page of news sites on multiple dates, and some of the media coverage during that time was emotionally charged. Despite the extensive media coverage, voir dire, conducted twenty-eight months after the shooting, showed that after those excused due to various reasons (some of which were opinions as to the defendant's guilt), fifty-seven percent (57%) of those remaining had no independent knowledge of the facts. Most of the forty-

three percent (43%) who had some knowledge of the case had only a vague recollection of events, which was mostly factual. Those who served on the jury assured the court they could decide the case based on the evidence presented at trial. In addressing the connection of government officials to publicity, the defendant noted that the district attorney made statements to the press regarding the gruesomeness/brutality of the incident. Comments to the press were also made by the sheriff. Additionally, the press was allowed to film the defendant, handcuffed and in prison garb, when he was brought into and out of the courtroom for his 72-hour hearing. The court noted that all comments by public officials occurred before June 11, 2007, when the defendant pled not guilty and the court imposed a gag order, which occurred twenty-eight months before trial. The court found the evidence did not support the defendant's claim that a hostile environment prevented him from receiving a fair trial. Next, in assessing the length of time between publicity and the trial, the court referred to the two years that elapsed between the initial media flurry and the trial. The court reviewed voir dire, noting that the prospective jurors were cautioned against exposing themselves to coverage of the trial, reminding them that their decisions must be based on what was presented in the courtroom. Defense counsel was afforded the opportunity to question each juror individually as to their exposure to media coverage, and those who indicated they would be unable to put aside pretrial publicity were excused. As for severity and notoriety of the offense, the court acknowledged that the case was extreme but noted it received no more notoriety than other capital cases. The court then noted that the 2000 United States Census showed St. Tammany Parish had a population of 191,268, and 500 were summoned for the jury pool. Only forty-three percent (43%) had heard something about the case, and only eleven percent (11%) were removed for having formed an opinion about the defendant's guilt.

Next, as for other community events that may affect or reflect the attitude of the jurors toward the defendant, the court noted that although some of the pretrial publicity focused on the community's reaction to the crimes, this occurred approximately twenty-eight months before trial. Further, the court noted that the public attention given to the victims and to the larger issue of domestic violence after the crimes did not equate to venire bias, especially considering the percentages discussed above.

Finally, the court addressed factors likely to affect the candor and veracity of prospective jurors. As support for his argument, the defendant noted that when asked to characterize the consensus of the community as to the appropriate punishment for the defendant, a prospective juror responded, "The death penalty. I'm just being honest." *Id*. at 304. The defendant also argued that the trial court used an inadequate jury questionnaire and restricted voir dire questioning on the issue of juror bias. However, the supreme court rejected the defendant's argument because the record did not show any limitation placed on defense counsel's ability to question potential jurors regarding their knowledge and/or bias. The court held that the defendant failed to prove the existence of an overriding prejudice in the community that prevented a fair trial, noting the record revealed the judge and both attorneys assessed each potential juror's ability to disregard any factual knowledge of the case and weigh the evidence presented. The court found no abuse of discretion in the trial court's denial of the motion for a change of venue.

In *State v. Garcia*, 19-920 (La.App. 1 Cir. 3/4/20), 300 So.3d 406, as in the present case, a motion to change venue hearing was held and granted prior to voir dire. In support of the motion, the defendant submitted twenty-five local news articles published in duplicate over three years, as well as a few national articles to establish that the public would not be able to answer honestly during voir dire

17

because of the atmosphere. The state asserted the issue was premature in that voir dire had not begun so the mindset of prospective jurors had not been examined. The motion for change of venue was granted, and the first circuit reversed, finding the trial court abused its discretion:

> The defendant relied solely upon news articles to attempt to establish that the state of the public mind against him was such that jurors would not completely answer honestly upon their voir dire or witnesses would be so affected by the public atmosphere that they would not testify freely and frankly. However, no polling or survey information was offered into evidence by defendant. Compare *State v. Felde*, 382 So.2d 1384, 1387 (La. 1980) ("[t]estimony was presented by two experts in poll taking who indicated to the court that potential jurors would tend not to be truthful during voir dire."); *State v. Montz*, 06-1068 (La.App. 4 Cir. 2/28/07), 954 So.2d 190, 191, vacated and trial court ruling changing venue reinstated, 07-653 (La. 11/21/07), 968 So.2d 727 (per curiam) (pollster testified that, based on two polls, "it was highly unlikely that the defendants would receive a fair trial in Orleans Parish."); *State v. McKnight*, 95-1486 (La.App. 1 Cir. 12/15/95), 665 So.2d 768, 771, vacated and trial court ruling changing venue reinstated, 96-0176 (La. 4/19/96), 671 So.2d 933 (professor and expert in the area of psychology and in the designing and conducting of surveys testified "comments made by the people surveyed in Livingston Parish showed hostility toward defendant.").

> Additionally, factual articles have less potential for prejudice than invidious or inflammatory articles. See *State v. Clark*, 02-1463 (La. 6/27/03), 851 So.2d 1055, 1071, *cert. denied*, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004) ("[c]ourts must distinguish, however, largely factual publicity from that which is invidious or inflammatory, as they present real differences in the potential for prejudice."). In this case, the news articles relied upon by defendant were factual, rather than invidious or inflammatory. In an article from 2015, Alonso-Llerena is described as "a Cuban national who has permanent legal residency in the United States." The fact that "[n]either defendant speaks English" and that they were "Spanish-speaking" is referenced in certain articles, but only in the context of explaining the presence of, or request for funding for, interpreters. Various articles set forth that the victims were "robbed, beaten, kidnapped, and strangled" and that their bodies were discovered in the back seat of their pickup truck in Hammond. However, no details, and particularly no pictures, concerning these facts are included.

> Further, the articles also spanned a period of over three years. Forty-three articles concerning a double homicide over such an extended period are less indicative of a hostile public atmosphere against defendant to overwhelm prospective jurors and witnesses than a media blitz. See *State v. Lee*, 05-2098 (La. 1/16/08), 976 So.2d 109,

133 & 136, *cert. denied*, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008) ("defendant was not the subject of media coverage for a prolonged period of time," where approximately sixteen months passed between arrest and trial and over 5000 pages of printed media and newscast transcripts were filed into evidence).

Additionally, the trial court ruled upon the challenge to venue prior to voir dire. Clearly, the court was not required to postpone ruling upon the motion until after voir dire. However, the number of jurors excused for cause, if any, may further illuminate whether prejudice against defendant existed in the public mind. As stated by the supreme court, "courts have examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind.... [I]n a community where the majority of prospective jurors will openly admit to a disqualifying prejudice, the reliability of other juror's assurances that they are impartial and have no preconceived notion may be drawn into question." *Clark*, 851 So.2d at 1071.

News articles in 2015 stated:

> Police believe Alonso[-Llerena], who was a landscaper for the Duplantiers and lived above a barn on their property, beat his employers until they allowed him access to the safe, according to a warrant. He then strangled the couple, who were discovered bound, and transported them with Garcia to the Hammond truck stop, police allege. The gas station's surveillance footage of two additional vehicles, along with cell tower evidence linked Alonso[-Llerena] and Garcia to the crime. It's unclear the exact role Garcia played in the couple's death.

Later articles set forth that "[i]nvestigators have said they believe Garcia and Alonso[-Llerena] went into the home and beat the couple to get the information needed to open the safe. Blood was found in several rooms, according to police." In a November 19, 2015 article (reported online November 20, 2015), East Baton Rouge Parish District Attorney Hillar Moore, III is quoted as saying, "[t]here were two people (in the Duplantiers' home), and we suspect it was these two." In a February 5, 2016 article, Moore is quoted as stating, "[b]ased on the evidence I have heard, this is the proper indictment."

To the extent that the East Baton Rouge Parish District Attorney and the police contributed to the publicity concerning the case, there was no allegation of, much less any evidence of, a strategy by government officials to prejudice the public mind against defendant with the release of publicity. Compare *Bell*, 315 So.2d at 308 & 311 (defendants, indicted for having incited and participated in a riot in which five people died and a television reported was severely beaten, alleged that "the district attorney had prepared a bill of information charging the defendants with the attempted murder of Bob Johnson, the

19

television newsman who remained comatose, which he would file shortly prior to the selection of the jury to further gain publicity and prejudice the public mind."). Further, prejudice, if any, to defendant from the comments of government officials would diminish between the reporting of the comments and the start of the trial still to commence in this matter.

The murders involved in this case, like any other first-degree murders, were severe offenses that generated notoriety. Motions for change of venue, however, have been denied in other first-degree murder cases of similar or greater notoriety. See *Lee*, 976 So.2d at 115-17, 123 n.8, 129, & 132 (recent graduate of the LSU MBA program stabbed 81 times, raped, and murdered by the South Louisiana Serial Killer who, approximately one month before trial in East Baton Rouge Parish (EBRP) was convicted in West Baton Rouge Parish (WBRP) of the second-degree murder of another victim and news coverage of the WBRP trial had flooded EBRP); *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, 1057-59, 1086 & 1103-04, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005) (defendant engaged in the perpetration of an aggravated burglary, armed robbery, and second-degree kidnapping when he killed the sixty-two-year-old female victim by slashing her throat, fracturing her skull, and fracturing twelve of her ribs); *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, 548-50, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000) (victim kidnapped, robbed, raped, and murdered "execution style" by her parking garage valet).

We also note that at the time of the 2010 Census, East Baton Rouge Parish had a population of 440,171. The size of the jury pool to be summoned is unknown at this time, but given the large population of East Baton Rouge Parish, the likelihood of a dearth of qualified prospective jurors is minimal.

Therefore, considering the evidence submitted by defendant, and in light of the factors set forth in *Bell*, we find that defendant fell short of demonstrating prejudice in the public mind such that a fair trial would be impossible. Accordingly, this assignment of error has merit.

*Id*. at 410–13 (footnotes omitted). In *Garcia*, the ruling granting the motion to change venue was reversed, and the case was remanded for further proceedings.

In *State v. Henry*, 446 So.2d 1308 (La.App. 2 Cir. 1984), the second circuit reversed the trial court's granting of a change of venue where the media publicity occurred in or prior to May 1983, and the trial did not occur until after January 1984. The newspaper articles were factual in nature. Although the two isolated television coverages were more troublesome, there was no proof of a widespread viewing or

20

influence caused thereby. There was no proof that the state participated in the distribution/broadcasting of the publicity. The court further found that the offense, although serious, was not particularly severe or notorious to the extent to render a change of venue necessary. The court concluded:

> Applying these facts to the principles enunciated in the jurisprudence concerning such motions, we conclude that the trial judge abused his discretion in ordering a change of venue. We are particularly compelled to arrive at this conclusion when we consider carefully the written reasons for the ruling of the trial court. There was a limited amount of evidence presented on behalf of the defendant at the hearing. Our interpretation of the trial court's reasons leads us to find that the evidence presented at the hearing did not form the basis for its ultimate decision to grant the motion. It is obvious that the trial court was ultimately swayed by two rather vaguely explained incidents that occurred outside of the record subsequent to the hearing and which seemed to concern the propriety of the court's action rather than any grounds which have been set forth as a basis for a change of venue under the Code of Criminal Procedure or the jurisprudence. First of all, because these considerations are outside of the record, they cannot form the basis for a change of venue because they are not based on evidence presented at the hearing or at any other stage of the proceedings. See *State v. Williams*, 397 So.2d 1287 (La.1981). Furthermore, it appears that the overriding consideration in the trial court's mind was the protection of the public from false and misguided representations and the protection of the integrity of the judicial system. While these are commendable considerations on the part of a judge in the conduct of his judicial function, they are not the controlling considerations in a determination of whether a defendant is entitled to a change of venue. The controlling consideration properly is whether prejudice, influence or other factors are such that they will affect the answers of the jury on voir dire and the testimony of the witnesses in such a manner that the defendant is unable to obtain a fair and impartial trial. In reality, we are of the opinion that should a trial court allow what are described as two "frivolous and unfounded statements" occurring outside of the record to mandate a change of venue the resulting effect of such a ruling would be to in fact allow such isolated statements to "cast an undue reflection on the integrity of the judicial system" rather than to protect the integrity of the judicial system from such irresponsible actions.

> Nevertheless, we are cognizant of the fact that the defendant's fundamental constitutional guarantee of an impartial jury and a fair trial should be staunchly protected. Accordingly, in the event that we have misjudged the situation in our review of the limited facts available to us in this record or in the event of further publicity or occurrences which result in adverse publicity to the defendant prior to trial, we simply vacate the ruling of the trial court and remand with instructions to the trial court to defer ruling thereon until after the voir dire of prospective

jurors in case difficulty is encountered in obtaining an unbiased jury. See *State v. Goodson*, 412 So.2d 1077 (La.1982); *State v. Rodrigue*, supra. The voir dire of the prospective jurors should be conducted in accord with the standard proposed by the American Bar Association's Standards Relating to Fair Trial and Free Press § 8-3.5 (1980) and the procedures set forth in *State v. Goodson*, supra.

*Id.* at 1312–13.

In *State v. Montz*, 06-1068 (La.App. 4 Cir. 2/28/07), 954 So.2d 190, *vacated and trial court ruling changing venue reinstated*, 07-653 (La. 11/21/07), 968 So. 2d 727 (per curiam), the state appealed the trial court's ruling changing venue prior to it conducting a voir dire of jurors. The fourth circuit found the trial court abused its discretion:

> In this case, a voir dire of potential jurors has not yet been conducted. Rather, the sole testimony presented at the motion hearing was that of the defendants' pollster who concluded that, based on two polls taken on behalf of the defendants, it was highly unlikely that an impartial jury could be empaneled in Orleans Parish. Mr. Walker testified that his polls showed that a (1) a high percentage of people saw the videotape and were familiar with the incident; (2) a majority of blacks polled think the incident was racially motivated; (3) the fact that 70% of the blacks polled said they could be fair jurors was problematic in light of the 59% who said they thought the bouncers were guilty.

> Clearly, such polls are beneficial to defense counsel in determining whether to file a motion for change of venue. However, poll results and the pollster's subsequent conclusion does [sic] not constitute an adequate substitute for the voir dire of potential jurors. We find no jurisprudence wherein a poll served as the primary basis for a change of venue or where such judgment was reached without an examination in court of potential jurors and we decline this opportunity to establish such a precedent. Additionally, we find that the trial court's other reasons for granting the motion for change of venue do not rise to the level of prejudice required by La.Code Crim. Proc. art. 622. Accordingly, we find that the trial court's judgment granting the defendants' motion prior to conducting a voir dire of potential jurors was, in effect, premature and an abuse of discretion. Therefore, we reverse the judgment and remand the matter to the trial court for further proceedings.

*Id.* at 192.

On review, the supreme court disagreed, holding:

The judgment of the court of appeal is vacated and the ruling of the district court is reinstated. The trial court's ruling on a motion to change venue "is a question addressed to the court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." *State v. Wilson*, 467 So.2d 503, 512 (La.1985). We find no abuse of discretion or manifest error in the trial court's ruling. *See State v. McKnight*, 95-1486, p. 7 (La.App. 1st Cir.12/15/95), 665 So.2d 768, 773 (reversing trial court's grant of motion to change venue; in the absence of a mock voir dire or an actual voir dire examination, defendant failed to show actual prejudice in the collective mind of the community on the basis of a survey conducted of 30 persons); *rev'd* 96-0176 (La.4/19/96), 671 So.2d 933-34 (reinstating order changing venue; no manifest error or abuse of discretion apparent in trial court's ruling).

*State v. Montz*, 968 So.2d 727. We do note that in *Montz* the defendant introduced a poll that indicated it was unlikely an unbiased jury could be empaneled in Orleans Parish, which distinguishes it from the present case where no polling data was introduced.

Likewise, in *State v. McKnight*, 95-1486 (La.App. 1 Cir. 12/15/95), 665 So.2d 768, *vacated and trial court ruling changing venue reinstated*, 96-176 (La. 4/19/96), 671 So. 2d 933, the first circuit found the trial court erred in granting a change of venue. The victim, a baby, went missing on July 15, 1994. Introduced at the hearing were fourteen editions (dated July 17, 1994, to January 19, 1995) of the local newspaper which was distributed twice a week with an average distribution of 9,903 copies. Each edition included one or more articles about the incident ranging from factual accounts of the search efforts, the arrests, the status of court proceedings, as well as statement by authorities that the defendant may be arrested for first degree murder due to evidence of her participation in the child's death and disposal of the body. The articles also included extensive discussion of the mysterious death of a different baby left in the defendant's care approximately two years earlier. In addition to the articles, the defendant introduced videotapes from three local television stations, including fifty-eight broadcasts about the case dating from July

15, 1994, through January 26, 1995. Brief press conference footage was contained on the tape from one station, while the other two stations had more extensive coverage of the search, discovery of the victim's body, the funeral, the arrests of the defendant and her boyfriend, and the subsequent court proceedings. Some footage showed the defendant in prison clothing and her prison cell. The broadcasts referred to information received from the District Attorney's Office and the Sheriff's Office, indicating they had reason to believe the defendant was involved and her charges may be upgraded to first degree murder if additional evidence was found. One report indicated that the District Attorney stated that the investigation of the death of the baby two years earlier was being reopened. Finally, the broadcasts contained interviews of the defendant's boyfriend and his mother, who both blamed the defendant for the death of both babies. One report mentioned that authorities were investigating the possibility that the victim had been molested prior to his death, and one indicated the defendant twice failed a polygraph test.

Called in support of the motion was a local college professor accepted as an expert in psychology and the designing/conducting of surveys. She conducted an informal survey of graduate students from three area parishes and found those from Livingston Parish were more opinionated and knowledgeable of the case than those of the other parishes. A more formal survey of people previously called for jury duty in St. Tammany and Livingston Parishes was conducted with nearly ninety-seven percent (97%) of the people surveyed in Livingston Parish having knowledge of the case; twenty of the thirty people believed the defendant was responsible for the child's death. Only twenty-one percent (21%) of those in St. Tammany Parish had knowledge of the case with no one naming the defendant as the person responsible; seventy-seven percent (77%) did not know who was responsible. After evaluating the results of the survey and reviewing newspaper articles and television

broadcasts on the case, the expert concluded it would be impossible for defendant to receive a fair trial in Livingston Parish. The trial court granted the motion to change venue from Livingston Parish. In reversing, the first circuit concluded:

> Applying these precepts, we conclude that the defendant has failed to show there is either actual or presumed prejudice against her to the degree a fair trial is impossible. As there has not yet been either a mock voir dire or an actual voir dire examination, it is impossible to decide at this point whether actual prejudice against the accused exists on the part of prospective jurors in Livingston Parish. *See Wilson*, 467 So.2d at 512–14; *Goodson*, 412 So.2d at 1080. Although the survey shows the Livingston Parish respondents were overwhelmingly familiar with the case, the survey alone of only 30 possible jurors does not establish actual prejudice in the collective minds of the community. Voir dire will establish whether prospective jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.

> We also find that this is not a case in which prejudice may be presumed. The record demonstrates only one courtroom disturbance, occurring during the hearing on motions, when a witness testified about the victim's face having deteriorated as a result of maggots. The court's comments indicate the disruption subsided quickly. Although we reverse the trial court's ruling, we notice that law enforcement officers and prosecutors released publicity about the case (through press conferences and interviews, including several on-camera interviews), indicating their belief defendant participated in the child's murder (something for which she was not charged) and fueling speculation defendant was involved in the death of the other child. However, we find the trial atmosphere has not been utterly corrupted by the press coverage. *See Goodson*, 412 So.2d at 1080–81. Additionally, defendant failed to present sufficient testimony establishing the extent of the publicity. There was no evidence concerning the viewership or ratings of the television stations or the population of Livingston Parish. *See Clark*, 442 So.2d at 1132–33.

> . . . .

> Thus, we conclude that the record before us does not support the trial court's determination that defendant could not have a fair and impartial trial in Livingston Parish. *See Bennett*, 527 So.2d at 1128. Accordingly, the ruling granting the motion for change of venue is vacated. We are influenced in our decision by the fact that by the time our judgment is final almost one and one-half years will have elapsed since the crime and the period of intense publicity following the crime. In all probability, the force of the publicity will have been spent before the time the case is set for trial. *See State v. Rodrigue*, 409 So.2d 556, 560 (La.1982). Nevertheless, in case we have misjudged the situation in our independent review of the facts, or in the event of further

25

unnecessary release of publicity, the trial court is instructed to defer ruling on the motion until after conducting either a "mock" voir dire or the actual voir dire. *See Rodrigue*, 409 So.2d at 560; *State v. Baldwin*, 388 So.2d 679, 682 n. 2 (La.1980). *See also Bell*, 315 So.2d at 311–12.

*Id.* at 773.

As in *Montz*, the supreme court disagreed and reversed:

The judgment of the court of appeal is vacated and the ruling of the district court is reinstated. The trial court's ruling on a motion to change venue "is a question addressed to the court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion." *State v. Wilson*, 467 So.2d 503, 512 (La.), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). We find no abuse of discretion or manifest error in the trial court's ruling.

*State v. McKnight*, 96-176 (La. 4/19/96), 671 So.2d 933, 933–34.

## I. *Analysis of Law and Jurisprudence to the Facts of this Case.*

We note voir dire has not yet occurred in this matter, which renders some of the analysis utilized in the above cases inapplicable; however, they, along with the *Bell* factors, lend guidance. Although we note the trial court was not legally required to wait until after voir dire to rule on the motion, the number of jurors excused for cause due to an opinion about Defendant's guilt or innocence certainly would have shed more light on the level of prejudice in the public mind. However, as can be seen from *Montz* and *McKnight*, the decision to rule on the motion despite the absence of a mock voir dire or an actual voir dire examination, cannot provide the basis for reversal of the trial court's judgment. That can only happen if we find the trial court abused its discretion in finding actual prejudice existed such that a fair and impartial trial in Acadia Parish was not possible.

We find the present case is not one in which prejudice should be presumed. Based on the record before this court, it has not been shown that the "trial atmosphere . . . is utterly corrupted by press coverage or . . . is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion

26

of fairness and rejects the verdict of the mob." *David*, 425 So.2d at 1246.  Thus, Defendant bore the burden of proving actual prejudice.

The court in *State v. Garcia*, 300 So.3d at 409, discussed the burden a defendant must meet to demonstrate actual prejudice:

> To meet this burden, a defendant must prove more than mere public general knowledge or familiarity with the facts of the case; he must demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case.  A defendant is not entitled to a jury entirely ignorant of his case and cannot prevail on a motion for change of venue simply by showing a general level of public awareness about the crime; rather, he must show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. Whether a defendant has made the requisite showing of actual prejudice is a question addressed to the district court's sound discretion which will not be disturbed on appeal absent an affirmative showing of error and abuse of discretion.

Although we recognize the discretion given to the trial court's judgment in this area, we find the trial court abused its discretion by granting the motion to change venue.

Considering first the nature of pretrial publicity and the degree to which it circulated in the community, as discussed above, most of the coverage of this murder and Defendant's prior conviction circulated in the few months following the murder.  Defendant introduced seven online articles from different sources.  A review of these articles reveals the coverage was factual in nature with very little being written that could reasonably be considered inflammatory.  It is also relevant to note that the last of these articles was published on June 27, 2021, nearly two years prior to the trial court's ruling in this case.  The details regarding Defendant's prior offense were arguably the most inflammatory of the articles, because it detailed the facts that the victim in that prior case was alive when his car was set on fire, and although Defendant did not set the fire, he was present.  A review of that article reveals it was factual in nature and set forth that Defendant was originally convicted as a principal

27

to second degree murder and sentenced to life in prison with no chance of parole. The article then noted Defendant was granted post-conviction relief due to a trial error. He was granted a new trial but on a lesser charge of principal to obstruction of justice. He then pled no contest to that charge in March 2012 and was sentenced to ten years with credit for time served. One article discussing the prior offense did conclude with the statement that "[o]ver two decades has passed since Earl Zenon was shot and killed. Another family is now mourning the loss of their son." While that comment does involve some degree of editorializing, it certainly is not a commentary on Defendant's guilt or innocence or not factual in nature. Counsel for Defendant both in brief and at oral argument strongly implored that the community would believe that Defendant "got off on a technicality" from his prior offense and "killed again." The State notes the phrase "got off on a technicality" is never used and the word "technicality" was used only one time in a May 26, 2021 online article. In our view, the first *Bell* factor, the nature of the pretrial publicity and the degree to which it circulated in the community, does not weigh in favor of granting the change of venue in this case.

As for the second factor, the connection of government officials with the release of the publicity, as discussed above, information was released by the Rayne Police Department, and it was factual in nature. The information quoted from the police chief in the media was factual in nature. Clearly, this factor did not support a change of venue, and the trial court noted in its reasons that it did not consider this factor.

As for the length of time between the publicity and trial, we note trial is currently set for November 2, 2023, and the information released was in early to mid-2021. Obviously, it is unknown what will be released between now and the time of trial, however there is no basis to argue this factor favors the granting of a

change of venue.  The trial court noted in its reasons that it did not consider this factor.

The fourth *Bell* factor concerns the severity and notoriety of the offense.  The facts of this case, while severe and notorious due to the youth of the victim and his connection to those well known in the community, are unfortunately not unlike those previously reviewed by this court.[1]  *State v. Kirklin*, 21-550 (La.App. 3 Cir. 2/23/22) (unpublished opinion) (2022 WL 534255), *writ denied*, 22-449 (La. 6/15/22), 339 So.3d 644 (defendant approached the minor victim (a recently estranged friend) from behind as he rode his bike past the defendant's house and shot him multiple times); *State v. Jackson*, 15-393 (La.App. 3 Cir. 11/4/15), 179 So.3d 753, *writ denied*, 15-2191 (La. 5/2/16), 206 So.3d 877 (two-year-old victim died from duodenal perforation at the hands of the defendant).  Unquestionably, this case does not have the notoriety of *State v. Lee*, 976 So.2d 109 (involving the notorious South Louisiana Serial Killer) and *State v. Manning*, 03-1982 (La. 10/19/04), 885 So.2d 1044, *cert. denied*, 544 U.S. 967, 125 S.Ct. 1745 (2005) (where the defendant engaged in the perpetration of an aggravated burglary, armed robbery, and second-degree kidnapping and killed a sixty-two-year-old female victim by slashing her throat, fracturing her skull, and fracturing twelve of her ribs) where motions to change venue were denied.  As to any evidence presented as to the notoriety of the offense, the trial court did reference the public comments made to some of the articles; however, there is no way of knowing if any of the specific comments noted by the trial court were made by residents of Acadia Parish.  Thus, considering it was Defendant's burden to establish this factor with something more than speculation, it does not support changing venue from Acadia Parish.

---

[1]This was the analysis employed in *Lee*, 976 So.2d 109 and *Magee*, 103 So.3d 285.

29

Next, the fifth *Bell* factor considers the area from which the jury would be drawn. Acadia Parish had a population of 57,576 per the April 1, 2020 Census, which makes it the eighteenth most populous parish in Louisiana. Obviously, Lafayette Parish has a greater population, with 241,753 residents according to the 2020 Census. Clearly, Lafayette Parish would offer a larger jury pool to choose from, however, that alone is not sufficient to warrant a change of venue. The written reasons rendered by the trial court reveal it drew several conclusions in determining Defendant could not receive a fair and impartial trial in Acadia Parish. It referred to Acadia Parish as a "small, close knit community" and "a parish where the phrase 'everybody talks' is true; information that is supposed to remain confidential, typically will not remain as such." These conclusions were not supported by any evidence adduced at trial and were speculative by the trial court. The trial court did note that it felt the need to halt court proceedings "on occasion" due to the number of people attending. One of these proceedings, a bond reduction hearing, was held on the one-year anniversary of the victim's death, which certainly could explain the emotional impact that event, on that date, may have had on family and friends. We agree with the State that it was erroneous for the trial court to assume the behavior of approximately one hundred emotionally invested people would mirror that of a parish of nearly 60,000 residents.

As for the sixth *Bell* factor, other events occurring in the community affecting or reflecting the attitude of the community toward Defendant, we note the coverage of Defendant's prior offense arguably had a negative impact; but the extent simply is unknown. The attitude of the community (even assuming the comments were made by residents of Acadia Parish) was reflected in Facebook comments and some were inflammatory; however, as with the news/media coverage, the comments were made well in advance of trial. Additionally, Defendant argued the fact that Judges

Smith and Earles recused themselves from this criminal case reflects a prejudice against him. There was no indication as to why Judge Smith recused himself; while Judge Earles issued a Recusal Order stating that he recused himself based on "presiding over prior criminal proceedings which renders him unable to conduct a fair and impartial trial." The record indicates Judge Earles presided over proceedings involving Defendant's prior conviction. As the State notes, Defendant did not call either judge to testify as to the reasons for recusal. Judge Scott Privat also recused himself from a civil action filed by the victim's family. Judge Privat mentioned a close relationship with the victim's family and that he was a member of the "Notre Dame Community." Although the recusals are a matter of public record, Defendant did not provide evidence or anything other than speculation that these judge self-recusals were indicative of any parish-wide bias against Defendant. The State also notes it introduced into evidence the court minutes demonstrating that Judge Michelle Breaux, who had replaced Judge Privat, denied a motion to change venue in the civil action. The trial court did not reference this factor in the reasons for judgment.

Finally, as for any factors likely to affect the candor and veracity of the prospective jurors, the fact that the victim and his family are connected to prominent people in the community may affect the candor of the prospective jurors in Acadia Parish, but without voir dire, it is difficult to know the extent. The trial court also stated in its reasons that it did not consider this factor.

As in *Garcia*, we find the trial court abused its discretion in that Defendant failed to prove prejudice in the public mind such that a fair trial would be impossible in Acadia Parish. The articles and news coverage presented at the hearing were from within the first several months of the crime in 2021, and were mostly factual, not inflammatory. Moreover, no polling evidence was offered, and there was no

31

testimony from any witness to substantiate the trial court's conclusion that "the community of person's where [Defendant's] jury will be pulled from has a prejudice towards him." The law is clear that the burden is on the Defendant seeking a change of venue to demonstrate the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case.

Accordingly, considering the evidence submitted by defendant, viewed in light of the factors set forth in *Bell*, we find Defendant did not meet his burden of demonstrating prejudice in the public mind such that a fair trial in Acadia Parish would be impossible. Therefore, the trial court erred in granting the change of venue.[2]

## DECREE

For the foregoing reasons, the judgment of the trial court granting the motion for change of venue is reversed. This case is remanded for further proceedings.

**REVERSED AND REMANDED.**

---

[2] As we noted earlier in this opinion, there is no legal requirement for the trial court to conduct voir dire before ruling on a motion for a change of venue. Similarly, we are aware of no legal impediment that prevents Defendant from re-urging/re-filing a new motion to change venue should voir dire reveal a perceived level of bias in the jury pool once it commences.